## 42661. COOK v. THE STATE.
(340 SE2d 891)

BELL, Justice.

Appellant, James Cook, was convicted in Cobb County of murder and two counts of aggravated assault. The jury found the presence of two statutory aggravating circumstances and recommended a death sentence. The case is here on direct appeal, for review under the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq., and for the sentence review mandated by OCGA § 17-10-35. We affirm.[1]

### Facts

Shortly after midnight, in the early morning hours of July 8, 1984, Marietta Police Sergeant Massey monitored a call about shots on McIntosh Street in Marietta. Since he was not far from McIntosh, Sgt. Massey responded, arriving approximately a minute later at the duplex residence of Johnny Rosser (also known as Johnny Check). Sgt. Massey observed James Cook standing in front of the residence, with his back to Massey, facing two men lying in front of him. As Sgt. Massey approached, stating "I'm a police officer," Cook turned, pistol in hand, with the hammer cocked, and his finger on the trigger. Sgt. Massey took the gun. It was still warm.

Other officers arrived, and a crowd began to gather, including a woman screaming that she had been shot. One of the two men lying in front of the duplex appeared to be dead; the other had been shot three times, but was still alive. The bystanders, some of whom had witnessed the shootings, began to relate to the officers what had happened. Some were quite excited, and Cook was transported to police headquarters to get him out of possible danger.

Jackie Menafee, the surviving male victim, testified at trial that, after having been to Johnny Check's earlier that evening, he had returned sometime after midnight to get cigarettes. As he was leaving, he met Gardner Perry, known to Menafee as "Pops," who wanted to talk to him. They sat down on some steps in front of the duplex and Perry asked for a cigarette. As Menafee prepared to get one, he heard a commotion, turned, and said, "Hey Pop, this dude's got a gun." A shot went off, and Perry fell over. Menafee, who had talked to Cook earlier that evening, asked him, "Well, why did you shoot the man?"

[1] Cook was sentenced to death February 23, 1985. A motion for new trial was filed March 20, 1985, and was amended June 27, 1985, and again on July 12, 1985. The motion for new trial was denied July 24, 1985. A notice of appeal was filed and the case was docketed in this court on August 30, 1985. Cook was given an extension of time to file his enumeration of errors and brief, which he filed October 9, 1985. The state was given until November 8, 1985 to file its brief, and the case was orally argued on November 14, 1985. Cook filed a supplemental brief on the day oral arguments were heard.

Cook responded, "What you got to do with it?" Then he shot Menafee in the leg. When Menafee asked why he had been shot, Cook shot him again. Menafee began to shout for help. Cook told him he was not dead yet, and shot him again.

Sandra King was standing outside the duplex next door, with her boyfriend. She heard shots and ducked. When she stood up, a shot struck her in the hip.

Two other witnesses saw Cook shoot Menafee as the latter sat on the steps. In addition, another witness testified that, after the shots were fired, Cook approached the witness, pointed the gun at him and threatened to shoot him too, and walked away, "snapping" his gun.

Cook testified that Menafee had offered the services of two prostitutes, for $105, and that he had declined. Menafee went outside, and soon afterwards so did Cook. When he went outside, he was surrounded by five or six people who demanded his money. Cook did not respond, and one of the men hit him in the stomach with a knife. Cook fell down the steps. When he jumped up, two men were rushing him and he shot them. One of them, Jackie Menafee, turned around and sat down for a few moments, then got up and charged again, so Cook shot him again.

At the sentencing phase of the trial, it was shown that Cook had been convicted of murder in 1950. In addition, two witnesses testified to two later shooting incidents.

Milous Stevenson, a retired taxi driver, testified that in 1964 he had picked up Mrs. Cook in downtown Marietta. As they were driving through Marietta, Mrs. Cook observed her husband in a car with another woman. She got out of the cab, went to the other car and got into a fight with the woman. Afterwards, Stevenson took Mrs. Cook home. While he was settling the bill, Cook arrived, carrying a 12 gauge shotgun, which he pointed at his wife. Her sister slapped the gun away, with the result that it was now pointed toward Stevenson. He attempted to pull it down, and it went off, shooting him in the side. Stevenson was in the hospital fourteen days.

Janie Durham testified that in 1981, she and several friends, including Cook, were gathered in a friend's backyard drinking. Some of the women began to tease Cook. After a while, Cook got up and went home. He returned later carrying a gun. Ms. Durham "hit the ground." She heard a shot, which "sprinkled" her leg. (She took out a warrant for his arrest, but dropped it later, after he paid her fine in a DUI case.)

*Enumerations of Error — Guilt Phase*

1. At the guilt-innocence phase of the trial, the court charged: "[T]he law, as well as reason, prevents a person from taking advan-

tage of his own wrong or excusing himself when the unlawful act strikes down an unintended victim. In legal contemplation, the intent follows the act through to its legitimate results, and the original intent is transferred from the one against whom it was entertained to him who actually suffered the consequences of the felonious act."

After the jury had deliberated for several hours, it asked the court whether the principle of transfer of intent could apply to the offenses of voluntary manslaughter and aggravated assault, in addition to murder.

After consulting with the attorneys outside the presence of the jury, the court answered the jury's question in this manner: "You members of the jury are the judges of the law and the fact, and I have charged you on this principle of transfer of intent, and it is for you to say whether the law fits the facts or the facts fit the law as to any crime you have before you for consideration in this trial. You are authorized to apply that principle of law to any of the crimes the accused is charged with committing or any of the crimes you are authorized to find him guilty of committing."

Cook timely objected to each of the foregoing charges. In his first enumeration of error, he contends that the charge was contrary to the evidence and was misleading and confusing.

Cook's argument is premised, in part, upon an assumption that the evidence does not authorize a finding that Cook formed an intent to kill before he fired the shot that struck Gardner Perry. With this assumption we cannot agree, and find that the evidence, although circumstantial, is sufficient to establish a pre-existing intent to kill.

It is true, as Cook contends, that in order for the doctrine of transferred intent to apply to the death of Gardner Perry, "the jury would have . . . to [find] in appellant an intent to kill . . . existing before Mr. Perry was shot." However, we do not agree with his further contention that the court's charge authorized the jury to convict Cook for the murder of Perry on the basis of "intent to commit an aggravated assault upon Mr. Menafee formed after Mr. Perry was killed," nor do we believe that any reasonable juror could have so construed the charge.

Regarding the supplemental instructions, we find that they simply informed the jury that the legal principle of transferred intent applies to offenses other than murder. We note that none of the offenses presented to this jury require that the necessary element of intent, to kill or injure as the case may be, must have been directed toward the person who actually was killed or injured. See OCGA §§ 16-5-1; 16-5-2; 16-2-1; 16-4-1; 16-5-20 and 16-5-21. Compare *Sandstrom v. Montana*, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979).

2. In his fourteenth enumeration, Cook contends the court erred by charging on felony murder.

The indictment alleges in count one that Cook "did unlawfully and with malice aforethought cause the death of Gardner Perry, a human being, by shooting him with a pistol." This allegation was sufficient to put Cook on notice that he committed an aggravated assault upon Gardner Perry, and the court did not err by instructing the jury on the offense of felony murder. *Jolley v. State,* 254 Ga. 624 (2) (331 SE2d 516) (1985).

Contrary to Cook's twentieth enumeration of error, the evidence supports the conviction for murder and two counts of aggravated assault. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The jury was not required to believe Cook's testimony over that of the state's witnesses, *Welch v. State,* 254 Ga. 603 (5) (331 SE2d 573) (1985), nor was the state required to establish a motive beyond a reasonable doubt, since motive is not an element of the offense of murder. *Hancock v. State,* 196 Ga. 351, 357 (26 SE2d 760) (1943).

3. The trial court gave a lengthy pre-evidentiary charge, including an explanation of the stages of the trial. After explaining the first step — opening statements — the court stated: "Second, the state will introduce evidence in support of the charges contained in the indictment."

Cook argues in his third enumeration that this charge "had the effect of telling the jury that the state's evidence would support the charges it had brought," and, thus, amounted to a forbidden comment upon the evidence. See OCGA § 17-8-57. In our view, to say that the state will offer evidence "in support of the charges" is not to predict that the state's evidence will *establish* the charges, and we find no error.

4. In his fourth enumeration, Cook argues that the chain of custody of a bullet was not established and the bullet should not have been admitted in evidence.

Detective Parker testified that he gave the bullet to Detective Reibly. Richard Ernest, a firearms examiner, testified that he received the bullet from Detective Reibly. Cook argues that because Detective Reibly did not testify, the "chain was broken." We disagree. The state showed to a reasonable certainty that the bullet offered in evidence was the same as that found at the scene of the crime. The absence of testimony from one law enforcement officer who handled the bullet is not by itself fatal to the chain of custody. *Johnson v. State,* 143 Ga. App. 169 (1) (237 SE2d 681) (1977).

5. State's exhibits 14 and 15 were photographs of the victim identified by Dr. Joseph Burton. One showed the victim as he lay at the scene of the crime. The other showed the wound in the victim's chest, as it appeared after the removal of his shirt. In his fifth and sixth enumerations, Cook argues that since Dr. Burton did not know the

victim, no proper foundation was laid for the admission of these pictures.

It is true that Dr. Burton could not from personal knowledge identify as Gardner Perry the person depicted in the photographs, but he could testify that the person depicted in the photographs was the person on whom he performed an autopsy. State's exhibit 1 was properly identified as a photograph of Gardner Perry and the jury could compare exhibit 1 with exhibits 14 and 15 and see that they depicted the same person. Cf. *Mincey v. State*, 251 Ga. 255 (11) (304 SE2d 882) (1983). Thus, the court did not err by admitting the latter two photographs.

6. In his seventh enumeration, Cook argues that the pistol taken from him by Sgt. Massey should not have been introduced in evidence because (1) it had been seized without probable cause, and (2) a chain of custody was not established.

Sgt. Massey arrived at the scene of a reported shooting and discovered Cook standing, with a pistol in his hand, before two prone men. When alerted to the officer's presence, Cook turned toward the officer, who observed that the gun was cocked and that Cook's finger was on the trigger. Even assuming, arguendo, that full probable cause was lacking at this point, the circumstances fully authorized the immediate seizure of the weapon and at least a brief investigative detention of Cook. *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). See *Devier v. State*, 253 Ga. 604 (7a) (323 SE2d 150) (1984), and cits. When the apparent state of affairs observed by Sgt. Massey was supplemented by statements of witnesses to the incident, probable cause for Cook's continued detention was undeniably present, and the arrest was lawful. *Durden v. State*, 250 Ga. 325 (1) (297 SE2d 237) (1982).

Regarding the chain of custody, what we said in Division 4 of this opinion applies here, inasmuch as the same deficiency is alleged.

7. In his fifteenth enumeration, Cook complains of the denial of sequestered voir dire. We find no abuse of discretion. *Sanborn v. State*, 251 Ga. 169 (3) (304 SE2d 377) (1983).

8. We find no merit to enumerations 16 and 17, challenging the constitutionality of our death penalty procedures.

9. Jury voir dire began on a Monday morning and continued until shortly past 4:00 p.m. on Wednesday. Cook requested a two hour recess to give counsel time to prepare for the jury selection. The court did not provide the two full hours asked for, but the court did recess for more than an hour between the completion of the voir dire and the commencement of the actual jury selection.

In his nineteenth enumeration, Cook argues that he was denied a sufficient time to prepare for the exercise of his peremptory challenges. We note that he was provided a recess more than four times as

lengthy as the minimum (15 minutes) required by Rule 11 of the new Uniform Superior Court Rules (which were not in effect when this case was tried), and we find no abuse of discretion here. Compare *Jones v. State*, 249 Ga. 605 (3) (293 SE2d 708) (1982).

10. Cook argues in his ninth enumeration that the indictment was insufficient and that his motion to dismiss should have been granted. We do not agree. As to each of the three counts, the indictment tracked the language of the appropriate statute and set forth the dates of the offenses and the county in which they were alleged to have occurred. See OCGA § 17-7-54; *Lyle v. State*, 131 Ga. App. 8 (3b) (205 SE2d 126) (1974).

We find no merit to Cook's complaint that the aggravated assault counts were defective because they fail to allege that the pistol was used "offensively against a person" or that it was an instrument that is "likely to or actually does result in serious bodily injury."

The Georgia Code defines an aggravated assault as an assault "(1) with intent to murder, to rape, or to rob; or (2) with a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." OCGA § 16-5-21 (a). Clearly, this code section specifies five different ways in which an assault may be aggravated; i.e., an assault is aggravated if it is committed (1) with intent to murder, (2) with intent to rape, (3) with intent to rob, (4) with a deadly weapon, or (5) with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury.

In this case, the state alleged that both assaults were committed with a deadly weapon. The state was under no obligation to indict Cook for additional varieties of the offense.

11. In his eighteenth enumeration, Cook asks us to find that blacks are unconstitutionally underrepresented on the grand and traverse jury lists in Cobb County. He relies in large part upon a study conducted for the Cobb Superior Court by Dr. Helen Ridley and Dr. Edward Hale of the Institute for Research in Public and Social Services at Kennesaw College in Marietta.

In 1984, this court amended the Unified Appeal Procedure to provide, inter alia, that superior courts in death penalty cases must certify that blacks, whites, men and women are not significantly underrepresented on the county's grand and traverse jury lists. Rule II (A) (6) of the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq. The new rule "requires correction of absolute disparities exceeding 5%, [and] was designed to ensure to the extent possible that disparities would be kept well below the constitutional minimum." *Parks v. State*, 254 Ga. 403, 408 (fn. 4) (330 SE2d 686) (1985). However, compliance with the rule cannot guarantee that the resulting list is

immune from all *possible* constitutional attacks, cf. *Allrid v. Emory University*, 251 Ga. 367 (306 SE2d 905) (1983), and the rule itself provides, in the last sentence thereof, that it "shall not be construed to deprive the defendant of any rights that he may have under the constitutions of the United States and the State of Georgia or under OCGA § 15-12-40." 252 Ga. at A-17.

As a general proposition, absolute disparities under 10% usually are sufficient to satisfy constitutional requirements. See *Machetti v. Linahan*, 679 F2d 236 (11th Cir. 1982). However, "[i]n *Norris v. Alabama*, 294 U. S. 587 (55 SC 579, 79 LE2d 1074) (1935), the [Supreme] Court found a prima facie denial of equal protection where no blacks had been called for jury service in at least twenty-four years, while the population of blacks in the county of indictment was approximately five percent. 294 U. S. at 590-91." *Morgan v. United States*, 696 F2d 1239, 1241 (9th Cir. 1983).

The absolute disparity in *Norris* was only 5% (the difference between the black percentage of the jury pools and the black percentage of the community), but the comparative disparity was 100% (the absolute disparity divided by the black percentage of the community).

Cook argues that, where the distinct group whose underrepresentation is at issue constitutes less than 5% of the community, an analysis of only the absolute disparity is insufficient, and that comparative disparity is a more relevant measure of the underrepresentation. Cf. *United States v. Rodriguez*, 776 F2d 1509, 1511 (fn. 4) (11th Cir. 1985).

To some extent we can agree with this assertion; however, a couple of caveats are necessary.

First, although comparative disparity is a better tool for analyzing the impact of a numerical underrepresentation on the distinct group whose underrepresentation is at issue, absolute disparity is a better measure of the effect of the underrepresentation on the jury list as a whole, and this is true no matter how large or small the distinct group is.[2]

Second, there will inevitably be errors in the data. These errors include sampling error, where the data is derived from only a sample of the population being studied, and non-sampling error, including human and mechanical errors in the acquisition and tabulation of the data.[3] The accuracy of both absolute and comparative disparities is

---

[2] For example, if a distinct group is underrepresented by 2% absolute, then a jury venire of 50 persons will contain, on the average, one less member of the group than it would if there were no underrepresentation, and this is true no matter whether the group constitutes 50% of the community or 2% of the community.

[3] See, e.g., 1980 Census of Population, General Population Characteristics (Georgia), Appendix D — Accuracy of the Data.

affected by the accuracy of the data, but comparative disparity can be affected far more dramatically than absolute disparity by small changes in the data when the distinct group in issue represents a small percentage of the community.[4]

In this case, it is alleged that the comparative underrepresentation of blacks on the Cobb County jury pool is 42.5%, and that this underrepresentation is unconstitutional notwithstanding an absolute disparity of less than 5%. For reasons which follow, we do not agree with Cook's measure of comparative disparity or with his contention that blacks are unconstitutionally underrepresented on the Cobb County jury list.

Assuming, without deciding, that the data regarding the composition of the Cobb County grand and traverse jury lists are accurate,[5] blacks comprise approximately 2.9% of each list. Cook's alleged comparative disparity is generated by a comparison of the *black* percentage of the jury pool with the percentage of *non-whites* in Cobb County.

This comparison is inappropriate in two respects. First, Cook has failed to show "that 'non-white' persons comprise a distinctive group singled out for special treatment under the law." *United States v. Lewis*, 743 F2d 859, 862 (11th Cir. 1984). Second, many non-whites are also non-black, and it simply is inaccurate to compare the percentage of blacks on the jury list with the percentage of non-whites in the community.[6]

---

[4] For example, if the group is estimated to constitute 4% of the community and 2% of the jury list, the resulting absolute disparity is 2% and the comparative disparity is 50%. If, in fact, the group constitutes only 3% of the community, then correction of the figures would reduce the absolute disparity to 1% while the comparative disparity would be reduced from 50% to 25%. Of course, in one sense, both disparities are affected equally in that each is halved by the change in the data. Nonetheless, halving 50% results in a far greater numerical reduction than does the halving of 2%, and this difference is important to the discussion which follows.

[5] As we noted in *Ingram v. State*, 253 Ga. 622, 628 (323 SE2d 801) (1984), only 62% of the jurors in Cobb County could be identified as to race by reference to the jury list, which was identical to the voter list, since for approximately ten years federal guidelines did not allow the recording of race on voter registration forms in Cobb County. The primary purpose of Dr. Ridley's study was to ascertain by statistical analysis the composition of the entire list.

A random sample of 7,000 names was drawn from the racial unknowns on the list. Using a mail-out questionnaire and a telephone survey, these persons were contacted (most by one means or the other, but some by both). Some of the questionnaires were returned as non-deliverable; some of the telephone numbers were "bad." Eliminating the non-deliverables and the bad numbers, the response rate was 87.6%. Comparing known data (the age and sex of the racial unknowns could be ascertained from the list) with the response data, both mail and telephone, sample data were generated, ostensibly descriptive of the entire sample of racial unknowns, which findings were then generalized to the entire population of racial unknowns on the jury list.

[6] This is true unless persons not tabulated as "White" by the census are listed as "Black" on the jury list. As pointed out in Appendix B to the 1980 Census of Population, General Population Characteristics (Georgia), supra, fn. 2, racial groups were tabulated from

The invalidity of such a comparison is particularly pronounced where, as in Cobb County, the black population is small and a measurable percentage of the total population is classified by the census as neither white nor black.

If we consider the population of Cobb County eligible for jury service, that is, 18 years of age or older, then blacks comprise 4% of the total (and not 5% as alleged by Cook).[7] The absolute disparity is therefore 1.1%, and the comparative disparity is 28% (and not 43%).

Since Cook relies upon Dr. Ridley's study, which suggests that comparative disparities exceeding 20% are constitutionally suspect, Cook undoubtedly would argue that even if the comparative disparity is only 28%, the jury list is nonetheless unconstitutional. But we do not think it is necessary or desirable to set an arbitrary limit to comparative disparity, and, in view of the shortcomings inherent in comparative disparities, if we did set such a limit, we would not set it nearly so low.

Not only is it difficult to precisely measure comparative disparity, given the dramatic effect of minor changes to the supporting data upon the final measurement, but, in addition, a comparative disparity figure cannot be evaluated as a mere abstraction, and the fact remains that even if the disparity shown here were entirely eliminated, the effect on the typical Cobb County venire would be very slight, amounting to an average of one-half a person per 50-person venire.

A defendant has no right to a jury selected from a list which perfectly mirrors the percentage structure of the community. What is required is a list which represents a *fair* cross section of the community and which is not the product of intentional racial or sexual discrimination. See, e.g., *Wilson v. State*, 250 Ga. 630 (3) (300 SE2d 640) (1983).

Cook has presented no evidence of intentional discrimination except whatever inference might result from the disparity alone, and the disparity shown here is insufficient to support an inference of purposeful discrimination. Cf. *United States v. Test*, 550 F2d 577, 587 (10th Cir. 1976).

Insofar as the fair-cross-section requirement is concerned, we

---

self-identification by respondents. Persons who identified themselves as white were tabulated as "White." Persons who did not classify themselves as one of the listed racial categories but marked "Other" and entered a response such as Canadian, German, Italian, etc., were tabulated as "White," but if they marked "Other" and entered a response such as Cuban, Puerto Rican, or Mexican, they were tabulated as "Other." Other persons not tabulated as "White" included American Indians, Eskimos, Japanese, Chinese, Koreans, Asian Indians, Vietnamese, Hawaiians, Guanamanians and Samoans. It is unlikely that any of these non-whites would be designated on the jury list as "Black."

[7] According to Table 45 of the aforementioned census publication, there are 8511 blacks over the age of 18 in Cobb County, out of a total 18-and-over population of 211,033.

note that the jury selection process in Cobb County is essentially that used in the selection of federal juries; i.e., jurors are randomly selected from the list of registered voters.[8] See 28 USCA §§ 1861, 1862, 1863.

"The use of voter registration lists was chosen by Congress in part because it provided each qualified citizen with an equal opportunity to cause his name to be among those from which random selection is made, and also because it was the largest generally available random source that was frequently updated. . . . Of course voter registration lists are imperfect — Indians may not vote as much as non-Indians, Hutterites may not vote as frequently as Catholics, Swedes in the Sixth Division may vote more often than Germans, young people may vote less than old — but this does not render use of those lists unconstitutional, especially considering the alternative, which is to set up a complicated procedure that takes into account the voting habits of all groups in the community, regardless of their size, and then supplement voter lists accordingly. No court has ever required this, and for good reason. The procedures in the Act, despite its imperfections, achieve the goal of the Sixth Amendment: through random selection from voter lists, defendants are insured of a jury pool drawn randomly from a fair cross-section of the community, and the evils of 'professional jurors' and the 'key-man system' are eliminated." *United States v. Hanson*, 472 FSupp. 1049, 1054 (D. Minnesota, Sixth Division 1979) (Hanson showed an absolute disparity of .7% and a comparative disparity of 54%). Compare *Parks v. State*, supra, 254 Ga. at 408-413.

Considering the manner in which the Cobb County jury lists are compiled, together with the extent of the disparity shown to exist, we find no unconstitutional underrepresentation of blacks and no error in the trial court's denial of Cook's jury challenges.

12. In his second enumeration, Cook complains of the state's opening statement and guilt-phase closing argument.

(a) Either party in a criminal case may make an opening statement in order to acquaint the jury with the nature of the case and with the facts each party expects the evidence to show.

In this case, the "facts" which the prosecutor predicted would be proven were supported by some evidence, or could be inferred from the evidence. The prosecution's opening statements were not im-

---

[8] It is true that the Cobb County grand jury list was supplemented with the names of persons known to the jury commissioners, and that, as a result, the grand jury list, unlike the traverse jury list, was not compiled in an entirely objective manner. (A personal decision to accept or reject an individual is inherently subjective. See *Bowen v. Kemp*, 769 F2d 672, 686-88 (11th Cir. 1985).) It has not been shown, however, that these subjective inclusions on the grand jury list were sufficiently numerous to significantly affect the composition of the list in any way, and they obviously did not affect the racial composition of the list.

proper.

(b) Cook timely objected to two portions of the state's closing argument.

In the first instance, the state argued, "If there ever was an example of malice in this courtroom ever, it comes from the testimony of your defendant. . . ." The defense interrupted to object to the state "characterizing this in terms of other cases and based on his judgment of what he's seen in this court." The state responded that it had not mentioned any other cases and had mentioned only the testimony in this case, which it was preparing to outline when the objection was made. The court overruled the objection. The state proceeded to outline the evidence and then concluded: "If that isn't malice, there never has been malice. If that behavior does not show you what's going on in his mind, nothing will."

Cook complains that this argument put before the jury facts not in evidence, in that the prosecutor compared this case to others and injected his own expert opinion on the evidence. The prosecutor, however, did not directly express a personal opinion or refer to facts not in evidence, and, as the United States Supreme Court has cautioned, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. De Christoforo*, 416 U. S. 637, 647 (94 SC 1868, 40 LE2d 431) (1974).

Especially in light of the state's response to the defendant's objection, we find the argument here to constitute no more than an attempt to urge the jury to apply its common sense to the facts of this case and, from those facts, to find defendant's contention of no malice to be unreasonable. See *Conklin v. State*, 254 Ga. 558 (11a) (331 SE2d 532) (1985).

In the second instance, the state argued: "Did you notice the witnesses as they testified for the state when it came time to point out the defendant? . . . Almost all hesitated and they stammered. They were scared to do it. There's more here than you've heard, but there's not more than you can surmise from what you've seen. . . ." Cook's objection to this argument was overruled.

Cook contends that the prosecutor asked the jury to consider facts not in evidence. We disagree. Again, although the argument could possibly be interpreted in a more damaging manner, the most reasonable interpretation is that the prosecutor was asking the jury to draw inferences from its observation of the demeanor of the witnesses. This the jury was entitled to do, and the argument was not improper. *Conner v. State*, 251 Ga. 113, 122 (303 SE2d 266) (1983).

(c) Cook now complains of other portions of the prosecutor's argument not objected to at trial. Although we are not prepared to give

the remainder of the argument our unqualified approval, we find nothing so prejudicial as to require reversal. See *Ford v. State*, 255 Ga. 81 (8(i)) (335 SE2d 567) (1985); *Walker v. State*, 254 Ga. 149 (14) (327 SE2d 475) (1985); *Spivey v. State*, 253 Ga. 187 (4) (319 SE2d 420) (1984).

### Enumerations of Error — Sentencing Phase

13. In his eighth enumeration, Cook complains of the state's evidence that he committed murder in 1950.

(a) State's exhibits 18, 19 and 20 were certified by the Clerk of the Superior Court of Troup County as being true and correct copies of the indictment, arraignment, verdict and sentence in the case of the State vs. James Cook, in which Cook was charged with and convicted of murder, with a recommendation of mercy.

An examination of state's exhibits 18, 19 and 20 shows them to be photostatic copies of typewritten records kept by the clerk of the Troup County Superior Court, rather than photostatic copies of the original indictment, arraignment, verdict and sentence. See OCGA § 15-6-62 (a); *White v. Newton Mfg.*, 38 Ga. 587, 593 (1869). Cook argues that since the original documents were not photocopied, state's exhibits 18, 19 and 20 were not properly authenticated, absent an explanation for the absence of the originals. We disagree.

Our Code allows the introduction in evidence of certified copies of public documents. OCGA § 24-7-20. Although copies of documents are commonly made photostatically these days, see OCGA § 15-6-87, that has not always been the case, and nothing in OCGA § 24-7-20 (which is descended from an Act approved December 21, 1819, long before photostatic copy machines had been invented) requires that certified copies be photostatic copies of the original documents. See Cobb's 1851 Digest at p. 272. The three exhibits appear to be, and were certified to be, verbatim copies of the original documents. Accounting for the whereabouts of the originals was not a necessary precondition to their admissibility.

Nor can we agree with Cook's complaint that the exhibits do not show that the indictment, judgment, or sentence were signed as required. The exhibits bear the names of all the persons whose signatures were required. Of course, these typewritten copies do not have the handwritten appearance of the original signatures, but the copies are not for this reason invalid.

(b) Cook further argues that a 1950 conviction is too old to be relevant. We disagree. Our Code explicitly makes a prior conviction for capital felony a statutory aggravating circumstance. OCGA § 17-10-30 (b) (1). The age of a conviction is a matter which the defense may argue in mitigation, but it is no ground for the exclusion of the

evidence.

(c) Finally, Cook argues that "[w]hat little information we have on the 1950 case strongly suggests that [Cook] was denied due process and . . . effective [assistance of] counsel . . ."

State's exhibits 18, 19, and 20 show on their face that Cook was represented by two attorneys and that they succeeded in obtaining for Cook a jury recommendation of mercy, without which he would have been sentenced to death.

In our view, what information we have strongly suggests that Cook was *not* denied due process or effective assistance of counsel. The conviction is presumptively valid, and the burden is on Cook to prove otherwise. He has failed to do so.

14. In his twelfth enumeration, Cook argues that the state did not provide timely notice of aggravating evidence. See OCGA § 17-10-2.

Cook was first arraigned on September 7, 1984. Afterwards, the state learned of his past record and decided to seek the death penalty. Cook was notified of this intention, and of the evidence that the state planned to offer in aggravation. Since a local rule of court required that notice of aggravating evidence be supplied prior to arraignment, Cook was re-arraigned on November 9, 1984.

Cook argues that the re-arraignment is constitutionally insufficient to cure the state's lack of compliance with the local rule of court regarding notice of aggravating evidence. However, the violation of a local rule of court (since superseded by the newly-adopted Uniform Superior Court Rules), without more, does not rise to the level of a constitutional violation. Cf. *Barclay v. Florida*, 463 U. S. 939 (103 SC 3418, 77 LE2d 1134) (1983). Cook has not established that notice was provided too late to allow him a reasonable opportunity to prepare for the sentencing phase of the trial. See *Brooks v. Kemp*, 762 F2d 1383, 1406 (fn. 36) (11th Cir. 1985).

Moreover, although Rule II (A) (1) of the Unified Appeal Procedure requires the prosecutor to announce prior to arraignment whether or not he intends to seek the death penalty, nothing in the Unified Appeal Procedure forbids a re-arraignment to cure the failure to begin following the Unified Appeal Procedure prior to the original arraignment. Cf. *Welch v. State*, 254 Ga. 603 (7) (331 SE2d 573) (1985).

15. The trial court did not err by allowing the state to show in aggravation the prior incidents involving Milous Stevenson and Janie Lee Durham, even though Cook was not prosecuted and convicted for these incidents. *Ross v. State*, 254 Ga. 22 (5) (326 SE2d 194) (1985); *Devier v. State*, 253 Ga. 604, supra at (9). See also *Tucker v. Kemp*, 762 F2d 1480, 1486-87 (11th Cir. 1985). Cook's eleventh enumeration is without merit.

16. Regarding the statutory aggravating circumstances, the court

charged as follows:

"Members of the jury, I charge you that the state contends that the offense of murder was committed under the following aggravating circumstances, to wit: One, the offense of murder was committed by a person with a prior record of conviction for a capital felony, to wit, murder; two, the offense of murder was committed while the offender was engaged in the commission of aggravated battery upon the person of Jackie C. Menefee.

"Members of the jury, I charge you that a capital felony, as that term is used in my previous charge, is a crime punishable by death or life imprisonment and includes the following crimes: murder, rape, armed robbery, kidnapping with bodily injury, or kidnapping for ransom.

"Members of the jury, I charge you that a person commits, quote, aggravated battery, unquote, within the meaning of my previous charge when he maliciously causes bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof."

In his thirteenth enumeration of error, Cook contends that the court's references to "my previous charge" confused the jury. We do not believe the jury could have been confused by these references, and find no merit to this contention.

Cook further contends that the charge on aggravated battery (see OCGA § 17-10-30 (b) (2)) was not supported by the evidence. We agree with the state's response to this contention: "Clarence Menefee testified at trial that, as a result of the gunshot wounds inflicted by [Cook], he lost the use of his bladder and was placed on a catheter for a month. Menefee further stated that, as a result of his wounds, a colostomy was performed and that as of the date of the trial he was still using a colostomy bag in order to defecate. Surely, evidence establishing loss of one's bladder and colon constitutes an aggravated battery." Appellee's brief, pp. 80-81.

The evidence supports both of the statutory aggravating circumstances found by the jury. OCGA § 17-10-35 (c) (2).

### Effectiveness of Counsel

17. In his tenth enumeration of error, Cook argues that his retained trial attorneys, Ray Gary, Jr., and Roy David Petersen, rendered ineffective assistance of counsel. Since this issue was raised on motion for new trial after an attorney had been appointed to represent Cook in the post-conviction proceedings, we may properly review it. *Brown v. State*, 251 Ga. 598 (3) (308 SE2d 182) (1983).

Before addressing the specific acts and omissions allegedly demonstrating ineffective assistance, we deem it appropriate to outline

generally the circumstances surrounding Cook's trial representation. See *United States v. Cronic,* 466 U. S. 648 (104 SC 2039, 80 LE2d 657) (1984).

Attorney Gary has been a member of the bar of this state for over 10 years. His legal experience includes service as an assistant solicitor and as judge of the magistrate court in Cobb County, as well as several years of private practice. He first talked to Cook on July 16, 1984. After Cook talked to several attorneys, he decided to retain the services of Mr. Gary, who thereafter met with Cook for several hours on July 20. Gary testified that he met with Cook at least once a month until the trial began in February. Gary filed a number of pre-trial motions, including a demand for discovery and an in-camera inspection of the state's file. The state responded to this motion by allowing Gary to personally review its file. See *Reed v. State,* 249 Ga. 52 (3) (287 SE2d 205) (1982). Gary undertook — successfully — to interview *all* of the state's witnesses. Moreover, Gary conferred with a number of other defense attorneys, some of whom had the death penalty experience that Gary lacked (including Allen Hirons, who now represents Cook), taking notes, gathering material, and discussing strategy. Roy Petersen, a former Fulton County assistant district attorney, was retained for additional assistance, especially with the technical aspects of the case.

At trial, defense counsel conducted an extensive voir dire examination, cross-examined all but two of the state's 15 witnesses, and made appropriate objections. In their closing arguments, defense counsel raised substantive issues and discussed plausible lines of defense.

Clearly, it cannot be said here that "counsel failed to function in any meaningful sense as the government's adversary," *United States v. Cronic,* supra, or that "[t]heir state of preparation qualified them only as spectators." *House v. Balkcom,* 725 F2d 608, 619 (11th Cir. 1984). Thus, in order to prevail on his ineffectiveness claim, Cook must, "by pointing to specific errors made by trial counsel," *United States v. Cronic,* supra, show (1) that his attorneys' performance was deficient, *and* (2) that this deficient performance actually prejudiced the defense, under the standards set forth in *Strickland v. Washington,* ___ U. S. ___ (104 SC 2052, 80 LE2d 674) (1984). See *Ford v. State,* 255 Ga. 81 (8) (335 SE2d 567) (1985).

With the foregoing in mind, we now undertake to evaluate the acts and omissions allegedly demonstrating ineffective assistance of counsel.

(a) Cook argues that his trial counsel challenged the array of the traverse jury too early and generally failed to understand the nature of such challenges.

The Unified Appeal Procedure contemplates that challenges to

the array (grand and traverse) should be raised and considered prior to trial. We cannot agree that Cook's trial counsel challenged the traverse jury array too early.

Nor can we agree that trial counsel's understanding of jury challenges fell below "the range of competence demanded of attorneys in criminal cases." *Cuyler v. Sullivan,* 446 U. S. 335, 344 (100 SC 1708, 64 LE2d 333) (1980). Cf. *Lucas v. Hamm,* 364 P2d 685, 690 (Cal. 1961). Moreover, since Cook has not demonstrated that his jury challenges could have succeeded in any event, he has failed to show prejudice. See Division 11 of this opinion.

(b) That defense counsel only reviewed the state's file one time prior to trial does not establish ineffectiveness.

(c) Trial counsel's cross-examination was not inadequate. Inconsistencies in the testimony of the state's witnesses were highlighted, and counsel sought to discredit some of the state's most important witnesses.[9]

Cook argues that trial counsel failed to properly impeach two state's witnesses, who admitted on cross-examination that they were on probation. Cook argues that certified copies of their convictions should have been introduced. See *Rolland v. State,* 235 Ga. 808, 811 (221 SE2d 582) (1976). However, Cook has not shown that either of these two witnesses had been convicted of a felony or of a misdemeanor involving moral turpitude, or, therefore, that either of these witnesses could have been impeached successfully by the introduction of such prior convictions.

(d) State's exhibit 2 (a photograph of Menafee's colostomy bag) was not inadmissible on the ground that it was inflammatory, nor was state's exhibit 10 (cartridge shells removed from Cook's gun) inadmissible for failure to establish a chain of custody. Therefore, the failure of trial counsel to make such objections does not establish deficient attorney performance.

(e) The shortness of trial counsel's opening statement does not show ineffective assistance.

(f) Cook argues that his trial counsel seriously underestimated the odds that Cook would be convicted of murder and sentenced to die if he went to trial and that this misjudgment had two adverse consequences: (1) Cook rejected the state's offer of a life sentence because he had been led to believe that he would be convicted only of voluntary manslaughter, and (2) trial counsel failed to prepare for a possible sentencing phase of the trial because of his "imbedded belief

---

[9] For example, on cross-examination, Jackie Menafee admitted that he had been drinking the night of the murder. Another state's witness testified on cross-examination that Menafee had a reputation "for getting high and running his mouth," and that he had been injured on two recent occasions as a result.

that the jury would return a manslaughter verdict."

Early in his representation of Cook, Gary approached the assistant district attorney to discuss the possibility of a plea agreement. The most lenient plea agreement the state would consider was a plea to murder and both counts of aggravated assault, for which the state would be willing to recommend a life sentence for the murder and 20 years, to be served consecutively, on each of the aggravated assault charges.

Gary researched the effect of such a plea and discovered that since Cook had a previous murder conviction, for which he had received a life sentence, he would not be eligible for parole for 25 years. See OCGA § 42-9-39 (b). Thus, since Cook was already 56 years old, he would not be eligible for parole until he was 81.

Gary communicated this fact to Cook. They discussed all the circumstances of the case, including Cook's claim that the first shot, at least, was fired in self defense, that the shooting had occurred on a Saturday night at a shot house, that everyone had been drinking, and, significantly, that the state's bad-character evidence would not come in until the sentencing phase of the trial. Gary "felt like it was a good likelihood that the jury would come back with a manslaughter verdict." He testified that he was aware that "if [Cook] got convicted [of murder], it was going to be a lot more of an uphill battle trying to keep them from giving him the death penalty," and that "we knew it was a gamble . . . I conveyed the [state's] offer and told him it was his decision . . . not my decision . . . [W]e'd be gambling his life, not mine . . . [W]e knew it was a gamble. We knew that anything might happen . . . that the very worst thing that could happen would be that [the jury] would find him guilty of murder and then decide to give him the death penalty, and . . . that that could happen and that might happen."

Clearly, Cook understood, or should have understood, that the consequences of refusing the state's offer could be harsher than the consequences of accepting it. He rejected the certainty of spending the next 25 years in prison for the uncertainty of a jury trial. We find that Gary's evaluation of the case and his advice to Cook fell "within the range of professionally reasonable judgments." *Strickland v. Washington,* supra, 104 SC at 2071.

Moreover, it is clear from the record that Gary prepared for a possible sentencing phase of the trial and that these preparations were begun well in advance of trial. Whether these preparations were adequate is another question, which we consider next, but we find no credible support for Cook's assertion that Gary's preparations were inadequate because of an "imbedded belief" that there would be no sentencing phase.

(g) Cook's most serious allegation is that his trial counsel "failed

to submit any mitigating evidence to the jury and their failure to do so cannot be justified as 'trial tactics.' "

At the hearing on the motion for new trial, Cook presented the testimony of 17 witnesses who, Cook claims, could have testified in mitigation if they had been asked to do so by Cook's trial attorneys. These witnesses included Cook's wife and two children, a friend of his residing in Marietta, his former Cub Scout den mother from LaGrange, and four sisters, two brothers-in-law, two nieces and four nephews.

Gary testified that he talked to Cook's wife and children in case he decided to use their testimony. He explained, however, that he decided not to put up character witnesses in mitigation because he was aware that the state had additional aggravating evidence that it was prepared to offer in rebuttal to any good-character evidence.

The state offered the testimony of Franklin McGuire at the motion for new trial, as an example of additional aggravating evidence it was prepared to offer in rebuttal. See *Buttram v. State*, 249 Ga. 652 (9) (293 SE2d 334) (1982).

McGuire has known Cook for over 20 years. Two months prior to Cook's arrest in this case, McGuire, his brother and Cook were all at a neighbor's house drinking. His brother got into an argument with Cook over an earlier incident in which Cook had pulled a gun on him. The brother pulled out a knife, and Cook left. Soon, the McGuires left also, in a pickup truck, by the only way out — a narrow dirt road. Cook was waiting by the side of this road with a shotgun. McGuire, who was driving, stopped and asked Cook what his problem was and Cook fired into the truck, through the open driver's window. The shot passed in front of McGuire and blew a hole in the passenger-side door. Several pellets hit McGuire's brother. Cook told the McGuires that if he had not liked them, he would have killed them. Then he told them to drive on.

There was another incident involving Cook's wife (aside from the one brought out at trial) in which Cook had thrown a bowl at his wife, cutting her on the head behind the ear. Cook's wife and son were both cross-examined about this incident at the hearing on the motion for new trial, as they would have been had they testified at trial.

Mrs. Cook testified that she and Cook had enjoyed a good marriage. She conceded that they had been in a few arguments and admitted being present when Stevenson, the taxi driver, had been shot in 1964. She further admitted that she had sworn out a warrant for Cook's arrest in 1981, and had filed an affidavit stating that Cook threw a bowl at her head and cut her in the arm with a knife. She also admitted that she sometimes took her children and left when Cook came home drunk.

His son Brian confirmed that when Cook had been drinking,

"[s]ometimes we would leave just to keep from arguing." He testified that he was upstairs when Cook attacked Mrs. Cook in 1981, and that he had called the police when he heard all the noise, "just to be safe." After the fight was over, he came downstairs and observed his mother, who was bleeding "a little bit on one of her ears."

One niece, who now lives in Marietta, testified that if she had been called at trial she would have asked the jury to spare Cook's life because she knew him to be innocent. He would not harm anyone and "never showed a temper." On cross-examination, however, she admitted that she had not been aware of the 1950 murder conviction or that Cook had been in the penitentiary for seven years. She also did not know that Cook's wife had taken a warrant on him in 1981, or that he had shot a taxi driver in 1964, or that he had shot at Janie Lee Durham in 1981.

All of the other family members live in LaGrange. Although Cook grew up in LaGrange, he was sent to the penitentiary in 1950, and moved to Marietta in 1959, soon after his release. He has been a resident of Marietta ever since. It is apparent from the testimony of these witnesses that their contact with Cook has been rather limited for the last 35 years.

His former Cub Scout den mother, for example, testified that she has known Cook since he was born. However, she has never been to Marietta. Although she was aware that Cook had been convicted of murder in 1950, she was not aware that he had been involved in any later shooting incidents or that he had attacked his wife.

One of his brothers-in-law testified that Cook was "kindly," and a "gentle person." He testified, "I have never known him to be violent," even though he was aware that Cook had been convicted of murder in 1950. However, he was not aware that Cook had assaulted his wife. He testified that if that had happened, he would no longer entertain the opinion that Cook was a gentle person.

One of Cook's sisters described Cook as sweet, not violent, and as being "too nice a person" to die. But, except for the 1950 murder and the crime on trial, she was not aware of the many acts of violence Cook had committed.

Invariably, the nieces and nephews did not know that Cook had committed murder in 1950, and none of the LaGrange relatives knew that Cook had shot Milous Stevenson, Janie Lee Durham, and Frank McGuire, or that he had attacked his wife, acts that Cook does not even now deny that he committed (whether or not he intended the injuries which resulted).

Gary knew that, if he put up witnesses to testify to Cook's good character, the state would not only add Frank McGuire's testimony in aggravation but would also try to prove other incidents. For example, Cook pled nolo contendere in 1970 to public drunk and cutting an-

other, and was fined in 1967 for threatening to murder, according to Cook's FBI rap sheet, of which Gary had a copy. Moreover, any character witnesses he put up were likely to be cross-examined as to their knowledge of all the prior incidents, further highlighting them. In addition, if Cook testified in his own behalf at the sentencing phase of the trial, he would be asked to explain these incidents, and Gary was afraid that Cook would not be able to handle such a cross-examination very well.

Cook now argues that these fears were unjustified, since these prior incidents were not admissible, absent convictions. Moreover, he faults Gary for not objecting to the three prior incidents that were admitted in evidence.

Gary did object strenuously to the admission of the 1950 murder conviction. He did not prevail, but we cannot fault his effort, which present counsel has not improved upon. See Division 13 of this opinion. Contrary to Cook's present contention, the other two incidents were not inadmissible for lack of a conviction, nor was the state limited to proving only statutory aggravating circumstances. See Division 15 of this opinion. Nor do we find unreasonable Gary's evaluation of the possible consequences of putting up character witnesses. At least some additional aggravating evidence could have been presented to rebut testimony that Cook was a kind, gentle and nonviolent person. *Buttram v. State*, supra.[10]

"Counsel has no absolute duty to present mitigating character evidence. *Stanley v. Zant*, 697 F2d 955, 961-62 (11th Cir. 1983). 'Having conducted a sufficient investigation, counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.' Id. at 965." *Mitchell v. Kemp*, 762 F2d 886, 889 (11th Cir. 1985). "[T]he scope of investigation is governed by a reasonableness standard." Id. at 888.

Gary's biggest problem with character evidence was that his client did not have good character. In view of Cook's indisputable history of violent behavior, we cannot fault Gary for failing to travel to LaGrange to seek relatives having limited communication with Cook for the last 35 years who would be willing to testify that Cook was a good, kind, nonviolent person, when the presentation of such evidence would lead directly to the presentation of considerable additional aggravating evidence, and when all of the aggravating evidence would be

---

[10] We need not decide whether we fully agree with the state's view of the scope of evidence admissible in rebuttal. In particular, we do not pass upon whether the mere fact of an arrest would be admissible in aggravation, in rebuttal or otherwise. Nor need we determine whether the state's tenuous evidence that Cook had been working in violation of social security laws while receiving social security benefits possesses sufficient indicia of reliability to allow its admission in evidence. See also *Ashe v. Swenson*, 397 U. S. 436 (90 SC 1189, 25 LE2d 469) (1970).

the subject of the state's cross-examination of every such character witness. Compare *Strickland v. Washington,* supra, 104 SC at 2071 ("Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in."); *Mitchell v. Kemp,* supra, 762 F2d at 890 ("[I]t was reasonable for the attorney to assume that the presentation of good character evidence might motivate the State to introduce Mitchell's prior conviction when it might not introduce it otherwise, even though it had the right to present the conviction in the absence of mitigating character witnesses.").

Gary accurately evaluated Cook's best chance as coming at the guilt phase of the trial, when the bad-character evidence would not be admissible and the jury might either believe Cook's claim of self defense, or might at least find sufficient provocation to reduce the crime from murder to voluntary manslaughter. OCGA § 16-5-2. However, he began laying the groundwork for a possible sentencing phase during the voir dire, when, among other things, in the course of asking prospective jurors whether they knew Cook or his family, Gary managed to inform each panel that Cook's wife had been working at Tip-Top Poultry for 17 years as a USDA chicken inspector, that his daughter had worked for three years with DCASR, a federal agency, and that his son was a student at North Cobb High School. Cook's family sat immediately behind Cook throughout the trial in a show of support for him.

Thus, without exposing the family to potentially damaging cross-examination, Gary managed to convey to the jury that Cook had a wife and children who cared for him.

Gary had thoroughly interviewed Milous Stevenson and Janie Lee Durham. As a result, Gary was aware that neither of the two witnesses the state intended to put up in aggravation wanted to see Cook get the death penalty. Hence, Gary was able to elicit from Stevenson, on cross-examination, testimony that the shooting was an accident, that Stevenson did not want Cook to go to the electric chair, that he felt "awful" about it, and that he would appreciate the jury giving Cook a life sentence. Likewise, Ms. Durham testified on cross-examination that she believed that her shooting incident was an accident and that she did not want to see Cook get the death penalty, either.

Thus, without opening the door to potentially damaging rebuttal testimony, Gary conveyed to the jury that all of the state's aggravating witnesses wanted Cook to receive mercy.

Although Gary did not put Cook on the stand at the sentencing phase of the trial, Cook was the last witness who testified at the guilt phase of the trial. Thus, without exposing Cook to a harmful cross-examination about his past character, Gary "humanized" Cook by

presenting him to the jury as a "real person . . . by his testimony." Moreover, Cook's testimony at the guilt phase of the trial was sufficient to present whatever might have been potentially mitigating about the circumstances of the offense, and, as well, laid the groundwork for Gary's later sentencing-phase argument on "whimsical doubt." See *Smith v. Balkcom*, 660 F2d 573, 580-581 (Unit B, former 5th Cir. 1981).[11]

In his closing argument, Gary argued whimsical doubt, reminding the jury of the inconsistencies in the testimony, the "missing pieces of the puzzle," and the unanswered questions as to "what happened out there and why it happened." He argued that Cook was a product of his "life script" and his poor background. He pointed out that Cook's family would suffer if he were executed and asked the jury what good would come from it. He argued that the death penalty is not a deterrent and that "violence begets violence." He told the jury that as a result of Cook's prior murder conviction, he would never get out of prison and asked, "[W]hy sentence James to death when you know he ain't never going to get out?" He reminded the jury that the state's two witnesses in aggravation did not want to see Cook executed, and he further reminded the jury that its verdict had to be unanimous and argued that if even one juror had any doubts about whether Cook deserved a death sentence, then he was "entitled to spend the rest of his life in prison."

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting to a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Cit.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls

---

[11] "The fact that jurors have determined guilt beyond a reasonable doubt does not necessarily mean that no juror entertained *any* doubt whatsoever. There may be no *reasonable* doubt — doubt based upon reason — and yet some *genuine* doubt exists. It may reflect a mere possibility; it may be but the whimsy of one juror or several. Yet this whimsical doubt — this absence of absolute certainty — can be real.

"The capital defendant whose guilt seems abundantly demonstrated may be neither obstructing justice nor engaged in an exercise in futility when his counsel mounts a vigorous defense on the merits. It may be proffered in the slight hope of unanticipated success; it might seek to persuade one or more to prevent unanimity for conviction; it is more likely to produce only whimsical doubt. Even the latter serves the defendant, for the juror entertaining doubt which does not rise to reasonable doubt can be expected to resist those who would impose the irremedial penalty of death."

within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Cit.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life; Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 343 (1983)." *Strickland v. Washington,* supra, 104 SC at 2065-2066.

Cook has failed to overcome the "strong presumption" that the performance of his trial attorneys at the sentencing phase of the trial fell within "the wide range of reasonable professional assistance." Ibid.

(h) From all of the foregoing, we conclude that Cook was not denied effective assistance of counsel.

### *Sentence Review*

18. We have already determined that the evidence supports the jury's finding of statutory aggravating circumstances. See Division 16 of this opinion. We find that the sentence of death was not imposed as the result of passion, prejudice, or other arbitrary factor, and we find that Cook's death sentence is neither excessive nor disproportionate to penalties imposed in similar cases, taking into consideration both the crime and the defendant. OCGA § 17-10-35 (c). We therefore affirm.

*Judgment affirmed. All the Justices concur, except Gregory, J., who concurs specially as to Division 4, and Weltner, J., who concurs specially as to Division 11.*

GREGORY, Justice, concurring specially.

While I concur in the majority opinion, I do not agree with the majority's conclusion that the chain of custody of the bullet found at the crime scene was properly proved. See Division 4, supra. However, in light of the fact that the defendant admits shooting the victim, any failure in proof regarding the chain of custody of the bullet is harmless error.

WELTNER, Justice, concurring specially.

I concur in the judgment of affirmance, but I disagree with the approach followed in Division 11.

In my opinion, this issue should be governed by the statutory requirements of OCGA § 15-12-40 (a) (1), which require that jury panels be "a fairly representative cross-section of the intelligent and upright citizens of the county. . . ."

The value of this rule is that it is simple to apply, and demands a

proper *result* — independent of often chimerical questions such as motive, design, and pattern. Hence, the legality of the array is tested by comparing the composition of the pool to the composition of the county.

In this case, any disparity relative to the participation of black citizens is less than 5%, and the panel clearly meets the requirement of the statute. That being the case, there is no need to consider all of the other matters treated in Division 11 of the majority opinion.

DECIDED MARCH 7, 1986 — RECONSIDERATION DENIED APRIL 1, 1986.

*Allen R. Hirons*, for appellant.

*Thomas J. Charron*, District Attorney, *Debra H. Bernes*, Assistant District Attorney, *Michael J. Bowers*, Attorney General, *Susan V. Boleyn*, Assistant Attorney General, for appellee.

APPENDIX.

*Walker v. State*, 254 Ga. 149 (327 SE2d 475) (1985); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Castell v. State*, 250 Ga. 776 (301 SE2d 234) (1983); *Tucker v. State*, 245 Ga. 68 (263 SE2d 109) (1980); *Davis v. State*, 241 Ga. 376 (247 SE2d 45) (1978); *Stephens v. State*, 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State*, 236 Ga. 697 (224 SE2d 910) ((1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975).