## S94P1047. BURGESS v. THE STATE.
(450 SE2d 680)

CARLEY, Justice.

Appellant was convicted of one count of malice murder, three counts of armed robbery, and five counts of kidnapping. Having found aggravating circumstances, the jury sentenced him to death for the murder. He received consecutive life sentences for the armed robberies and consecutive 20-year sentences for the kidnappings. Appellant appeals from the judgments of convictions and sentences entered by the trial court on the jury's verdicts.[1]

---

[1] The crimes occurred on July 16, 1990. Appellant was indicted during the April 1990

1. The jury was authorized to find that, on July 16, 1990, appellant and his co-defendant, Norris Young, first approached Laura and Randall Nuttle as they were entering their room at the Best Western Motel in Douglas County. As Young attempted to engage the Nuttles in conversation, appellant forced his way into their room. Appellant was armed with a gold-plated revolver. Appellant and Young made the Nuttles lie down on the bed, tied them up, and then began rummaging through their personal belongings.

The Nuttles testified that the two men were African-American and that one of the men was taller with longer curly hair and carried no weapon, while the other, who displayed the gold-plated revolver, wore a baseball cap and had a gold front tooth. Laura Nuttle testified that, when she heard voices outside the motel room, the man with the revolver left, but the taller man remained in the room. The Nuttles also testified that, when they subsequently heard two shots fired, the man in their room left. Laura Nuttle identified Young as the man who stayed in their room until the shots were fired. Neither of the Nuttles was able to make a positive identification of appellant as Young's accomplice. However, jewelry recovered from appellant's home was determined to belong to Laura Nuttle and appellant's fingerprints were found on a credit card taken from Randall Nuttle.

Regina Thomas, the fiancee of the murder victim, Liston Chunn, testified that, on July 16, 1990, she and Chunn were staying with her children in the same Best Western Motel. That evening, she noticed two African-American men standing in the doorway of the room next to hers. One of the men came over and forced his way into her room with a gold-plated revolver. Her two children were sent to the bathroom. The man told Thomas and Chunn to lie on the floor, but Chunn did not do so. Thomas testified that the gunman shot Chunn after Chunn failed to follow the gunman's order to remove his hand from the pocket of his pants. After the fatal shot was fired, Thomas heard a second person tell the gunman to get out of the room. Thomas further testified that Chunn had a soft drink cup which spilled when the shots were fired. She stated that Chunn "may have thrown" the cup, but that she "was never able to realize the sequence, whether he threw it at the shooter or if he dropped it when he was shot." While Thomas was not able to identify the gunman, her son picked appellant out of a lineup.

term of court. On November 27, 1990, the State filed its notice of intent to seek the death penalty. Voir dire commenced on January 21, 1992, and trial of the case began on February 3, 1992. The jury returned its verdicts in the guilt-innocence phase on February 15, 1992, and returned its sentencing phase verdict on February 19, 1992. Appellant filed his motion for new trial on March 23, 1992. The trial court denied the motion on January 31, 1994, and appellant filed his notice of appeal on March 7, 1994. Following extensions of time, the case was orally argued on October 12, 1994.

A repairman working at the motel noted the license number of a Volvo speeding away after he heard screaming. The vehicle's registration showed appellant's address. Janice Burgess, wife of appellant, testified that appellant had given her a diamond ring on the night that the crimes had been committed. It was determined that this ring had been taken from Laura Nuttles. Janice Burgess also testified that appellant had a gold tooth which he sometimes wore. In addition to items taken during various robberies, a gold-plated revolver was found in a search of appellant's home. A firearms expert from the GBI Crime Laboratory testified that the bullet which killed Chunn had been fired from this weapon.

Young told the police appellant had confided that he shot Chunn and had done so because Chunn "was reaching for something." Appellant, who had been paroled from a life sentence for murder only eight months previously, admitted participating in the armed robberies, but denied being the triggerman.

In addition to this evidence of the crimes committed on July 16, 1990, the State also offered evidence to show that, several days prior thereto, two African-American men had forced their way into Linda Pfeifer's La Quinta Inn room in College Park. One man held a gold-plated gun to her head and demanded money. The robbery was thwarted when her husband and children returned to the room. Her husband had been shot as the men fled, but he was able to see them drive away in a tan Volvo. Appellant was identified from a photo array as one of the robbers.

During the same period of time, a similar robbery involving two African-American men and a gold-plated revolver took place at the Days Inn in Clayton County. Appellant was placed at the scene of this crime by a Days Inn employee who identified him as someone who had been seeking information about a guest at the time of the robbery.

Approximately two weeks prior to July 16, 1990, Billy McNutt was robbed at a Days Inn in DeKalb County by two African-American men, one of whom threatened him with a "yellow" gun. A watch taken from McNutt was later recovered from appellant.

From this evidence, a rational trier of fact could have found appellant guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Appellant made a motion for funds to hire an expert on jury composition. This expert was to determine whether African-Americans were underrepresented on the grand and traverse juries. The denial of this motion is enumerated as error.

The record shows that there was only a 3.4 percent racial disparity as to the grand jury and a zero percent racial disparity as to the traverse jury. Such disparities would be sufficient to withstand any

attack that might be made. *Cook v. State*, 255 Ga. 565, 570 (11) (340 SE2d 843) (1986); Unified Appeal Procedure, Rule II (A) (6). Therefore, appellant has not shown a reasonable probability that the denial of his motion rendered his trial unfair. *Isaacs v. State*, 259 Ga. 717, 725 (12) (c) (386 SE2d 316) (1989); *Crawford v. State*, 257 Ga. 681, 686 (5) (362 SE2d 201) (1987).

3. Appellant urges that inquiry into the issue of his parole eligibility was erroneously restricted on voir dire.

The record shows that, on voir dire, appellant was allowed great latitude to pose questions regarding parole, even though such questioning generally is not permitted. *Davis v. State*, 263 Ga. 5, 7 (7) (426 SE2d 844) (1993). Further, this court has repeatedly held that in cases, such as this, wherein OCGA § 17-10-31.1 (d) is inapplicable, the issue of a defendant's parole eligibility is an inappropriate matter for jury consideration. *Quick v. State*, 256 Ga. 780, 785 (9) (353 SE2d 497) (1987); *Thornton v. State*, 264 Ga. 563 (449 SE2d 98) (1994). Thus, a prospective juror's personal views regarding the meaning of a life sentence or parole eligibility are extraneous to his or her ability to serve as a juror, unless it can be shown that those views would seriously impair the juror's performance of his or her duties. Appellant has made no such showing with regard to any of the prospective jurors in this case.

4. In an interracial capital crime, it is permissible to inform the prospective jurors of the victim's race in order to question them about racial bias. *Legare v. State*, 256 Ga. 302, 303 (1) (348 SE2d 881) (1986). Thus, it was not error to inform the prospective jurors that some of the victims in this case were white.

5. Appellant urges that the trial court erred in refusing to strike certain potential jurors for cause based upon their alleged racial bias.

A criminal defendant certainly has a right to explore issues of racial bias during voir dire, thereby enabling him to use his peremptory strikes to remove suspected biased members of the panel. *Legare v. State*, supra at 303 (1). See also *Georgia v. McCollum*, 505 U. S. ____ (112 SC 2348, 2358, 120 LE2d 33) (1992). However, appellant has not cited any authority for the proposition that prospective jurors are required to be stricken for cause absent a showing that they otherwise are unqualified to serve. No such showing was made here.

6. Appellant urges that the trial court erred in refusing to strike certain potential jurors for cause based upon their alleged bias in favor of the death penalty.

While there may have been some initial equivocation in the answers of the contested potential jurors, the record nevertheless supports the trial court's ultimate determination that, based upon the answers to subsequent questions, each was capable of serving as an impartial juror and would weigh evidence in mitigation and seriously

consider the option of a life sentence. *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985); *Ledford v. State*, 264 Ga. 60, 64 (6) (b) (439 SE2d 917) (1994).

7. Appellant urges that the trial court erred in refusing to strike certain prospective jurors for cause based upon their alleged bias against the return of a verdict of "guilty but mentally retarded."

Again, there may have been some initial equivocation in the answers of the contested potential jurors. However, the record supports the trial court's ultimate determination that, based upon the answers to subsequent questions, each was capable of serving as an impartial juror. A trial court's determination of a potential juror's ability to serve is not limited to the juror's opinion of his own impartiality. *Lively v. State*, 262 Ga. 510 (1) (421 SE2d 528) (1992).

8. During voir dire, a prospective juror stated that his wife had been a desk clerk at the motel at the time of the crimes and had since become a manager. Appellant urges that the trial court erred in refusing to strike this prospective juror for cause, on the ground that he was "so near of kin to the . . . victim as to disqualify him by law from serving on the jury." See OCGA § 15-12-163 (b) (4).

> While *kinship* to the victim may automatically disqualify prospective jurors in a criminal case pursuant to OCGA § 15-12-163 (b) (4), mere *employment* by [one not the] actual victim . . . is *not* a *per se* disqualification. . . ."

(Emphasis in original.) *Willingham v. State*, 198 Ga. App. 178, 179 (2) (401 SE2d 63) (1990). The motel was not itself a "victim" and the employment of the spouse of a prospective juror by an entity which is neither a victim nor a party to the case is not a ground for automatic disqualification. Accordingly, the trial court did not err in refusing to strike this prospective juror for cause.

9. Several enumerations of error relate to the trial court's striking of certain potential jurors for cause based upon their expression of opposition to imposing the death penalty.

The record shows that the trial court was authorized to find that these potential jurors' views would prevent them from considering a death sentence and thus impair them from performing their duties as jurors. *Wainwright v. Witt*, supra at 424; *Hill v. State*, 263 Ga. 37, 40 (6) (427 SE2d 770) (1993). Accordingly, there was no error. That another trial court previously had found one of these prospective jurors to be qualified to serve in a death penalty case does not support appellant's contention that the trial court in this case was not evenhanded in its treatment of death-qualification issues.

10. Three potential jurors on the initial panel of forty-two were African-Americans. The State sought to strike all three for cause on

the ground that appellant had either arranged for various persons to contact them or had contacted them himself. It is undisputed that two of these potential jurors actually were contacted and asked to "do right" by appellant if selected for jury duty. The third, Barbara James, testified that she had not been contacted by appellant. However, fellow inmates of appellant and a girl friend of one of these inmates testified that they had assisted appellant in arranging at least two three-way telephone conversations in which a juror named "Barbara" was contacted. One inmate testified that appellant himself had attempted to contact Barbara James, but that her husband had answered the phone and hung up on appellant.

On this evidence, the trial court granted the State's motion to excuse Barbara James for cause, concluding that it was necessary to do so out of an abundance of caution. The trial court's decision to strike Barbara James for cause will not be overturned absent a "manifest abuse of discretion." *Taylor v. State*, 243 Ga. 222, 224 (2) (253 SE2d 191) (1979). No such showing has been made here.

11. The State and appellant agreed that one of the three prospective jurors who had been stricken because of appellant's jury tampering would be replaced with the only other African-American member of the venire, Morey Ellison. However, the State ultimately used one of the six peremptory strikes that it exercised to remove Ellison from the jury. After Ellison was peremptorily stricken, appellant made an unsuccessful *Batson* motion.

On appeal, appellant urges the trial court erred in denying his *Batson* motion because the reasons the State gave for striking Ellison were pretextual and applied equally to white prospective jurors whom the State did not strike. According to the State, however, its reasons for striking Ellison had been racially-neutral: his strong opposition to the death penalty and his inability to state whether he could put aside preconceived notions about the death penalty; his prior criminal charge of driving under the influence of which he was acquitted; and, the fact that he had a mentally retarded brother who died at the age of 21. Moreover, Ellison was the *only* prospective juror who had *all* of these characteristics. *Smith v. State*, 264 Ga. 449, 452 (3) (448 SE2d 179) (1994). Under these circumstances, appellant has not supported his claim that the State's reasons were pretextual. Rather, the record supports the trial court's determination that a discriminatory purpose was not involved in the State's use of a peremptory strike to remove Ellison. *Gamble v. State*, 257 Ga. 325, 326 (4) (357 SE2d 792) (1987).

12. The jurors were sequestered at a motel located only a short distance from the motel in which the crimes took place. Appellant concedes that the State instituted protective measures to ensure that the jurors had minimal exposure to the crime scene itself. He urges, however, that the jurors nevertheless must have compared their hous-

ing situation to that of the victims in this case, given their proximity to the crime scene.

The motel in which the jurors were sequestered was the only motel in Douglas County other than the one in which the crimes took place. Sequestration of the jury was required by OCGA § 15-12-142. Since no alternative housing options were available and neither impropriety nor prejudice has been demonstrated, appellant has failed to show reversible error based upon the site where the jurors were sequestered.

13. On appeal, appellant has not substantiated his claim that the impartiality of his trial was impaired because the bailiffs were permitted to wear their customary uniforms rather than civilian clothing. *Bennett v. State*, 262 Ga. 149, 154 (13) (414 SE2d 218) (1992). Compare *Zant v. Gaddis*, 247 Ga. 717, 718 (2) (279 SE2d 219) (1981).

14. Appellant urges that the trial court erred in failing to provide to him, pursuant to his *Brady* motion, a police sketch of the crime scene depicting the location of the cup which the murder victim "may have thrown" at the gunman.

According to appellant, the police sketch would have supported a finding that the murder victim had been making a threatening gesture prior to being shot. However, appellant has failed to demonstrate how the police sketch differed from photographs of the crime scene depicting the location of the paper cup or how his lack of access to the sketch deprived him of a fair trial. *Dennis v. State*, 263 Ga. 257, 259 (5) (430 SE2d 742) (1993).

15. At the guilt-innocence phase, the State offered into evidence an "Identikit" sketch of a man wearing sunglasses who resembled appellant. In the trial court, appellant's only objection to the admission of this evidence was that the detective who identified the sketch was unauthorized to do so because he had no knowledge of "Identikits." However, the detective identified the sketch as one which had been made at his request by another detective who was certified to do so. A witness who saw the writing being made may testify to its genuineness. *Martin v. State*, 135 Ga. App. 4, 7 (3) (217 SE2d 312) (1975). Accordingly, the trial court did not err in admitting the "Identikit" sketch over appellant's objection.

16. At the guilt-innocence phase, the trial court permitted the State to offer evidence of appellant's attempts to tamper with the jury selection process. Appellant urges that it was error to admit this evidence for the jury's consideration.

The evidence related to whether, as the State claimed, appellant has sufficient mental capacity to engage in an attempt to manipulate the judicial system or whether, as appellant claimed, he has "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior." OCGA § 17-7-131 (a)

(3). Thus, the evidence was relevant to rebut appellant's claim that he was mentally retarded. Evidence which is relevant and material to the issues in the case is not rendered inadmissible merely because it may have some prejudicial effect. See *Simon v. State*, 253 Ga. 681, 682 (2) (324 SE2d 455) (1985).

17. The trial court admitted into evidence during the guilt-innocence phase certain crime scene and pre-autopsy photographs of the murder victim, as well as a bloody shirt worn by him. The trial court also admitted into evidence during the sentencing phase a photograph of the murder victim whom appellant had been convicted of murdering in 1978.

The photographs admitted in the guilt-innocence phase were relevant to the issues and were properly admitted. *Burgan v. State*, 258 Ga. 512, 514 (3) (371 SE2d 854) (1988). The murder victim's shirt was admissible to illustrate the location of his wounds and to rebut appellant's claim that he shot the victim in self-defense. *Crozier v. State*, 263 Ga. 866, 867 (2) (440 SE2d 635) (1994). The photograph of the earlier murder victim was properly admitted in aggravation during the sentencing phase.

18. Appellant enumerates as error the admission of evidence of his commission of a similar armed robbery in 1977.

A prior similar transaction generally cannot be proved solely by introduction of a certified copy of the conviction. *Stephens v. State*, 261 Ga. 467, 468 (6) (405 SE2d 483) (1991). A prior similar transaction may not be proved solely by the uncorroborated testimony of an accomplice. *Hill v. State*, 236 Ga. 831 (225 SE2d 281) (1976). In this case, however, the State produced both the detailed testimony of appellant's accomplice in the 1977 armed robbery and a certified copy of appellant's conviction for that crime. Taken together, this evidence was sufficient to render the 1977 armed robbery admissible as a prior similar transaction. *Stephens v. State*, supra; *Williams v. State*, 261 Ga. 640, 642 (2) (c) (409 SE2d 649) (1991).

19. While testifying to the facts of the 1977 armed robbery, appellant's accomplice in that crime made reference to appellant's commission of a sexual assault upon the female victim. Appellant unsuccessfully objected to this testimony on the ground that the State was attempting to introduce evidence of an unrelated prior transaction of which he had not been given notice.

The record shows that appellant had sufficient notice that the entire scope of events involved in the 1977 armed robbery would be presented as a similar transaction so as to satisfy the requirements of *Williams v. State*, supra. The State did not offer evidence of the sexual assault upon the female victim of the 1977 armed robbery as a separate and distinct prior crime, but as part of the events involved in the prior similar armed robbery. There was no reversible error in the

admission of this evidence.

20. During closing arguments in the guilt-innocence phase, the prosecutor stated that

> you ask yourself if you are nine months pregnant and a black man comes in the room, puts a gold gun to your head and says lay down, I'm going to tie you up. . . .

We disapprove of this argument, as the jurors were thereby "invited to place themselves in the victim's place in regard to the crime itself. [Cit.]" *Horne v. State*, 192 Ga. App. 528, 529 (2) (385 SE2d 704) (1989). However, given the overwhelming evidence against appellant, we conclude that it is highly probable this statement did not contribute to the jury's verdict of guilt. *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976). See also *Horne v. State*, supra at 528 (2).

21. Several other enumerations of error relate to the prosecutor's statements during his closing argument at the guilt-innocence phase.

Appellant characterizes certain of the prosecutor's statements as impermissible victim impact evidence. There is considerable doubt whether statements made during the closing argument of the guilt-innocence phase may ever constitute victim impact evidence within the meaning of *Sermons v. State*, 262 Ga. 286, 288 (1) (417 SE2d 144) (1992). In any event, the record shows that appellant did not object to the prosecutor's allegedly impermissible statements. Moreover, there is no reasonable probability that the prosecutor's statements had the effect of changing the result of the trial. *Todd v. State*, 261 Ga. 766, 767 (2) (410 SE2d 725) (1991).

Likewise, appellant did not object to the prosecutor's reference to the evidence that appellant previously had been in the penitentiary and there is no reasonable probability that this statement by the prosecutor changed the result of trial. *Todd v. State*, supra.

22. During closing arguments in the guilt-innocence phase, defense counsel suggested that the State had misrepresented and, perhaps manufactured, evidence. In his responsive closing argument, the prosecutor countered that this argument was "ludicrous" and that the jury should examine the "credibility of the lawyer." Given the context of this exchange, the prosecutor's remarks cannot be characterized as an attempt to impute guilt to appellant by impugning the character of his counsel. *Fugitt v. State*, 256 Ga. 292, 295 (1) (d) (348 SE2d 451) (1986).

Later in his closing argument, the prosecutor stated that appellant's actions "involved some conning of some lawyers, some conning of some lawyers in this courtroom. . . ." Defense counsel made a motion for mistrial and the jury was sent to the jury room. When the jury returned, the trial court denied the motion for mistrial and in-

structed the jury that, during the discussions which had occurred while they were out of the room, "nothing came up . . . to indicate that the defendant's counsel gave telephone numbers to anybody." When the prosecutor resumed his argument, he explained to the jury that he was trying to make the point that appellant was smart enough to find the potential jurors' phone numbers "without the assistance of any lawyer."

The prosecutor's remarks in this exchange likewise cannot be regarded as an attempt to impugn the integrity of defense counsel, but, rather, as a comment on appellant's ability to manipulate the judicial system. There was no error in denying the motion for mistrial.

23. The trial court's charge at the guilt-innocence phase accurately stated the statutory requirement that mental retardation must be found beyond a reasonable doubt in order for the jury to return a verdict of "guilty but mentally retarded." OCGA § 17-7-131 (c) (3).

24. At the guilt-innocence phase, the trial court charged that a verdict of "guilty but mentally retarded" would result in appellant being "sentenced to prison for life as to the murder charge." Subsequent to appellant's trial, we did hold that such a charge should not be given. *State v. Patillo*, 262 Ga. 259, 260 (417 SE2d 139) (1992). However, the record shows that appellant himself specifically requested that the trial court give the charge in this case. Thus, the giving of the charge does not constitute reversible error under the facts of this case.

25. Appellant requested an instruction regarding the credibility of a witness who testifies under a grant of immunity. The trial court correctly refused to give this instruction, since there was no evidence before the jury that any witness had testified under a grant of immunity.

26. Appellant contends that the trial court erred in failing to give a requested instruction on voluntary manslaughter.

A trial court must give a written request to charge on a lesser included offense if there is any evidence to support it. *State v. Alvarado*, 260 Ga. 563, 564 (397 SE2d 550) (1990). In this case, however, there was no evidence to authorize a charge on voluntary manslaughter as a lesser included offense. The fact that the murder victim "may have" tossed a soft drink cup in the direction of appellant is, as a matter of law, insufficient to create "serious provocation" which results in "a sudden, violent and irresistible passion." OCGA § 16-5-2.

27. Appellant urges that it was error to fail to give a charge on self-defense.

Evidence that the murder victim refused to remove his hand from his pants pocket upon request and possibly threw a paper cup at appellant is not evidence of a confrontation between the two men sufficient to support a charge on justification. OCGA § 16-3-21. Compare

*Heard v. State*, 261 Ga. 262 (3) (403 SE2d 438) (1991).

28. The trial court's charge adequately explained the concept of reasonable doubt to the jury. Considering the charge in its entirety, the trial court's use of the language "moral and reasonable certainty" in defining the State's burden of proof did not constitute reversible error. See *Baldwin v. State*, 264 Ga. 664 (449 SE2d 853) (1994); *Vance v. State*, 262 Ga. 236, 237 (2) (416 SE2d 516) (1992). There is no reasonable likelihood that the jury interpreted the charge as permitting a conviction on a lesser standard of proof than is constitutionally required. *Victor v. Nebraska*, 511 U. S. ___ (114 SC 1239, 127 LE2d 583) (1994).

29. As a young child, appellant was placed in the custody of the Fulton County Department of Family and Children Services (DFCS). Prior to trial, defense counsel subpoenaed all of appellant's DFCS records so as to determine whether there was evidence in mitigation of the sentence to be imposed. However, the trial court conducted an in camera inspection of the entire DFCS file pursuant to OCGA § 49-5-41 (a) (2) and provided only a portion of the records to appellant. The remainder of the records were sealed for review by this court. Appellant urges that it was error to fail to provide him direct access to the entirety of the DFCS file.

The trial court properly conducted an in camera inspection of the file rather than providing it, in its entirety, directly to appellant. OCGA § 49-5-41 (a) (2). See also *Stripling v. State*, 261 Ga. 1, 6 (7) (401 SE2d 500) (1991). A review of the sealed records which were not provided directly to appellant shows the existence of certain information which might be characterized as potentially mitigating and which, therefore, should have been provided to him. *Lockett v. Ohio*, 438 U. S. 586, 604 (98 SC 2954, 57 LE2d 973) (1978); *Spivey v. State*, 241 Ga. 477, 479 (2) (246 SE2d 288) (1978). However, this information relates only to facts regarding appellant's own personal childhood experiences and not to such matters as might otherwise be unknown to him. Moreover, the expert witnesses who testified in appellant's behalf were given access to the entirety of the DFCS file. Even if appellant had been given direct access to the information contained in the sealed records, he suggests no use to which the information might have been put other than as a basis for his experts' testimony for the defense. Under these circumstances, any error in failing to allow appellant himself to serve as the mere personal conduit for providing potentially mitigating evidence to his experts was harmless at most. See generally *Jenkins v. State*, 260 Ga. 231, 233 (4) (391 SE2d 397) (1990); *Phillips v. State*, 255 Ga. 539, 540 (1) (340 SE2d 919) (1986).

30. The trial court did err in permitting the jury to consider the five counts of kidnapping as aggravating circumstances. *Crawford v. State*, 254 Ga. 435, 440 (5) (330 SE2d 567) (1985). However, the inva-

lidity of these aggravating circumstances would not affect the validity of any of the remaining aggravating circumstances found by the jury. *Hill v. State*, 263 Ga., supra at 40 (22); *Zant v. Stephens*, 250 Ga. 97, 100 (2) (297 SE2d 1) (1982).

31. Relying on *Johnson v. Mississippi*, 486 U. S. 578 (108 SC 1981, 100 LE2d 575) (1988), appellant urges that his sentence of death must be set aside because his two prior convictions which were admitted into evidence were unconstitutionally obtained.

The holding in *Johnson* relates to the imposition of a death sentence which was predicated in part upon a prior conviction subsequently determined by a court of competent jurisdiction to be constitutionally invalid. Appellant's two prior convictions are currently valid and are not the subject of collateral attack. Absent a determination by a court of competent jurisdiction that these convictions are invalid, the trial court did not err in permitting the jury to consider them as statutory aggravating circumstances. See *Moon v. State*, 258 Ga. 748, 759 (31) (375 SE2d 442) (1988).

32. Appellant contends that the prosecutor was erroneously permitted to suggest to the jury during closing arguments in the sentencing phase that any lingering doubt as to guilt should not be considered a mitigating circumstance.

The record shows that the prosecutor merely pointed out that defense counsel would probably ask the jury to consider residual or lingering doubt when deciding who actually shot the victim, but that he was asking the jury to stand by its verdict in the guilt-innocence phase finding that it was appellant who had shot the victim. A defendant certainly may argue the issue of residual doubt to the jury. *Cook v. State*, supra; *Moon v. State*, supra at 759 (33). However, it is not improper for the State to ask the jury to rely upon the findings implicit in its verdict of guilt in determining the sentence to be imposed. The prosecutor's argument cannot be characterized as asking the jury either to disregard or to minimize mitigating circumstances.

33. Citing *Simmons v. South Carolina*, 512 U. S. ___ (114 SC 2187, 129 LE2d 133) (1994), appellant urges that, at the sentencing phase, the trial court erred in failing to charge on parole eligibility. However, that case only stands for the relatively narrow proposition that, where the State makes an issue of the defendant's future dangerousness during the sentencing phase of a capital trial and state law *prohibits* the defendant's release on parole, the jury must be informed that the defendant is ineligible for parole. *Simmons v. South Carolina*, 114 SC, supra at 2198. Since OCGA § 17-10-31.1 (d) is not applicable here, state law would *not* prohibit appellant's release on parole.

In a State in which parole is available, how the jury's knowl-

edge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole. States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like, should be kept from the jury in order to provide "greater protection in [the States'] criminal justice system than the Federal Constitution requires." [Cit.]

*Simmons v. South Carolina*, 114 SC, supra at 2196.

Thus, the trial court was not required to give the instruction regarding parole requested by appellant and the failure to give that instruction was not error.

34. A trial court is not required to charge, even on request, that the State must prove "extrinsic crimes admitted in general aggravation . . . beyond a reasonable doubt." *Ward v. State*, 262 Ga. 293, 301 (29) (417 SE2d 130) (1992).

"In considering this evidence [of extrinsic crimes], the jury does not attempt to decide whether particular elements have been proved, but instead makes a unique, individualized judgment regarding the punishment that a particular person deserves. . . ."

*Ross v. State*, 254 Ga. 22, 31 (5) (d) (326 SE2d 194) (1985).

35. The trial court did not err in refusing to give appellant's request to charge the jury that its failure to agree unanimously on a verdict would result in a life sentence. *Fugate v. State*, 263 Ga. 260, 263 (5) (b) (431 SE2d 104) (1993).

36. Appellant urges that the trial court erred by refusing to instruct at the sentencing phase that the jury could not return a death sentence if it found by a preponderance of the evidence that he was mentally retarded.

It is the public policy of this state that the execution of mentally retarded defendants constitutes cruel and unusual punishment. *Fleming v. Zant*, 259 Ga. 687 (386 SE2d 339) (1989). To that end, the General Assembly has enacted a statute which provides for a procedure whereby the execution of mentally retarded defendants will be foreclosed. As noted in Division 23, that statute mandates that the factfinder in a capital trial must decide at the guilt-innocence phase whether to return a verdict of "guilty but mentally retarded." OCGA § 17-7-131 (c) (3). As is the case with regard to a verdict of "guilty but mentally ill at the time of the crime" under OCGA § 17-7-131 (c) (2), the plain language of OCGA § 17-7-131 (c) (3) requires that the

defendant prove his mental retardation beyond a reasonable doubt in order to be found "guilty but mentally retarded." See *Brantley v. State*, 262 Ga. 786, 792 (7) (d) (427 SE2d 758) (1993); *Foster v. State*, 258 Ga. 736, 745 (11) (374 SE2d 188) (1988); *Spivey v. State*, 253 Ga. 187, 188 (1, 2) (319 SE2d 420) (1984). There is no constitutional impediment to this statutory requirement that the defendant meet a beyond a reasonable doubt standard as to the issue of mental retardation. *Brantley v. State*, supra at 792 (7) (d); *Foster v. State*, supra at 745 (11); *Spivey v. State*, supra at 188 (2). Accordingly, if, and only if, the factfinder finds beyond a reasonable doubt at the guilt-innocence phase that the defendant is "guilty but mentally retarded," "the death penalty shall not be imposed and the court shall sentence the defendant to imprisonment for life." OCGA § 17-7-131 (j). Compare OCGA § 17-10-60 et seq. which deals only with a trial court's ultimate stay of scheduled execution based upon mental incompetency rather than the factfinder's initial determination as to mental retardation at the guilt-innocence phase.

In two habeas corpus cases, this court has held that mental retardation is to be proved by a preponderance of the evidence and not beyond a reasonable doubt. See *Zant v. Foster*, 261 Ga. 450 (406 SE2d 74) (1991); *Fleming v. Zant*, supra. The defendants in those cases were not tried under the statutory procedure established by our legislature to effectuate the public policy against the execution of mentally retarded defendants. Nevertheless, it is clear that the intent of those cases was to give the defendants therein

> essentially the same opportunity to litigate the issue of [their] mental retardation as [they] would have had if the case[s] were tried today, with the benefit of the OCGA § 17-7-131 (j) death-penalty exclusion.

*Zant v. Foster*, supra at 451 (4). However, in order for that "same opportunity" to attach, mental retardation would have to be proved beyond a reasonable doubt. The public policy evidenced by the death-penalty preclusion of OCGA § 17-7-131 (j) is that it constitutes cruel and unusual punishment to execute only those defendants who have met the burden of proving their mental retardation beyond a reasonable doubt at the guilt-innocence phase in accordance with OCGA § 17-7-131 (c) (3). In some future case, this court may have occasion to reconsider the validity of these holdings in *Zant v. Foster* and *Fleming v. Zant*. However, this case presents no such occasion. Those habeas corpus cases are distinguishable. Unlike the defendants in those cases, appellant was tried under the statutory procedure established by our legislature to effectuate the public policy against the execution of mentally retarded defendants, appellant's counsel did

raise the issue of appellant's purported mental retardation for the jury's consideration during the guilt-innocence phase and the trial court gave full and fair instructions on the return of a verdict of "guilty but mentally retarded." Despite compliance with the applicable statutory procedure, the jury found appellant guilty. Accordingly, that guilty verdict did not result in an automatic life sentence based upon appellant's mental retardation and it then became necessary for the case to proceed to a sentencing phase.

At the sentencing phase, appellant certainly was entitled to produce evidence in mitigation of the imposition of the death sentence, including a reintroduction of the evidence of his purported mental retardation. However, appellant was not entitled to have the jury charged that it could not impose a death sentence if it found by a preponderance of the evidence that he was mentally retarded. The issue of whether appellant's purported mental retardation, standing alone, would preclude, as a matter of law, the imposition of a death sentence had already been determined by the jury's rejection of a "guilty but mentally retarded" verdict in the guilt-innocence phase. At the sentencing phase, the issue of appellant's purported mental retardation was no longer conclusive as to his sentence, but was merely one of the mitigating factors which the jury would be authorized to consider in determining appellant's sentence. The only requirement on the part of the trial court was to charge in accordance with OCGA § 17-10-30. Under that statute,

> [i]t is not required that specific mitigating circumstances be singled out by the court in giving its instructions to the jury. [Cits.] . . . All the mitigating circumstances which the accused has introduced and wishes to be considered may be argued to the jury, and a nonspecific charge, free of examples, allows the jury to consider anything it finds proper.

*Collier v. State*, 244 Ga. 553, 569 (12) (261 SE2d 364) (1979). Appellant makes no contention that a proper, nonspecific charge on mitigating circumstances was not given in this case.

Accordingly, appellant erroneously contends that his death sentence must be reversed because, at the sentencing phase, he was entitled to have the jury charged that it could not impose a death sentence if it found by a preponderance of the evidence that he was mentally retarded. The giving of such a charge is entirely inconsistent with the General Assembly's establishment of a specific procedure for determining whether a defendant who claims to be mentally retarded should be sentenced automatically to life imprisonment, rather than be subject to the possibility that the jury would impose the death penalty at the sentencing phase. In this case, the trial court properly

conducted the sentencing phase, and the jury, after having reconsidered appellant's purported mental retardation along with the other relevant mitigating and aggravating factors, returned a death sentence. That death sentence cannot be reversed for lack of any charge singling out mental retardation as a mitigating circumstance.

37. The evidence supports the jury's findings of the following aggravating circumstances: the murder was committed by a person with a prior record of conviction of murder, OCGA § 17-10-30 (b) (1); the murder was committed by a person with a prior record of conviction for armed robbery, OCGA § 17-10-30 (b) (1); the murder was committed while appellant was engaged in the commission of armed robberies against three separate victims, OCGA § 17-10-30 (b) (2); the murder was committed while appellant was in the commission of a burglary, OCGA § 17-10-30 (b) (2); and, the murder was committed by appellant for the purpose of receiving money or other things of monetary value, OCGA § 17-10-30 (b) (4).

38. We do not find that appellant's death sentence was imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix support the imposition of the death sentence in this case.

*Judgments affirmed. All the Justices concur, except Hunt, C. J., Fletcher and Sears, JJ., who concur in the judgment only as to Division 33, and Benham, P. J., who concurs in part and dissents in part.*

APPENDIX.

*Osborne v. State*, 263 Ga. 214 (430 SE2d 576) (1993); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Miller v. State*, 259 Ga. 296 (380 SE2d 690) (1989); *Kinsman v. State*, 259 Ga. 89 (376 SE2d 845) (1989); *Lee v. State*, 258 Ga. 762 (374 SE2d 199) (1988); *Moon v. State*, 258 Ga. 748 (375 SE2d 442) (1988); *Cohen v. State*, 257 Ga. 544 (361 SE2d 373) (1987); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987).

HUNT, Chief Justice, concurring.

Respectfully, I concur in judgment only as to the conclusion reached by the majority in Division 33, relating to the issue in *Simmons v. South Carolina*, 512 U. S. \_\_\_\_ (114 SC 2187, 129 LE2d 133) (1994). I do not agree that *Simmons* should be construed so narrowly that it applies *only* where state law prohibits parole with respect to a life sentence — that is, where a life sentence precludes release. I agree with the interpretation given *Simmons* by the New Mexico Supreme

Court in the case of *Clark v. Tansy*, 882 P2d 527 (N.M. 1994), that, if the prosecutor, in the sentencing phase, offers evidence or argument of the defendant's future dangerousness and such evidence or argument implies release on parole, the defendant may, at his or her option, through evidence, argument, or court instructions, inform the jury of the relevant statute governing eligibility. It seems fundamental that if the state's evidence or argument permits a jury inference concerning parole eligibility that may be untrue, a defendant may appropriately demonstrate any statutory provision to the contrary. In Burgess's case, the statute makes him ineligible for parole for 25 years. OCGA § 42-9-39 (b). However, the only evidence in Burgess's trial even remotely suggesting the possibility of parole involved the state's cross-examination of a defense expert witness. Burgess's objection to that evidence was sustained by the trial court who addressed the matter to the jury appropriately and sufficiently. Therefore, I agree with the conclusion of Division 33.

I am authorized to state that Justice Sears joins in this concurrence.

BENHAM, Presiding Justice, concurring in part and dissenting in part.

While I concur in the majority's affirmance of appellant's conviction, I respectfully dissent to the majority's affirmance of appellant's death sentence.

1. Appellant contended at trial and on appeal that the trial court erred when it refused to instruct the jury at the sentencing phase that the jury could not recommend imposition of a death sentence if it found by a preponderance of the evidence that appellant was mentally retarded. Appellant's proposed instruction was in accord with our decisions in *Fleming v. Zant*, 259 Ga. 687 (386 SE2d 339) (1989), and *Zant v. Foster*, 261 Ga. 450 (406 SE2d 74) (1991). In *Fleming*, we addressed the contention that Fleming's death sentence violated the federal and state constitutional guarantees against imposition of cruel and unusual punishment, and concluded that the Georgia constitutional guarantee forbade the execution of a mentally retarded person. We determined that imposition of a life sentence upon a finding by a preponderance of the evidence that a defendant was mentally retarded ensured that guarantee. See also *Zant v. Foster*, supra at Division 5. The majority now attempts to distinguish the holdings in *Fleming* and *Foster* on the ground that they were habeas corpus cases brought by defendants convicted prior to the enactment of OCGA § 17-7-131 (c) (3). However, that purported distinction does not stand up under close scrutiny — in both *Fleming* and *Foster*, the case was remanded to give the defendant a full evidentiary hearing on the issue of retardation before a jury in the court in which the original

trial was conducted. Having been granted that evidentiary hearing, Fleming and Foster stood, procedurally, on equal footing with the defendants tried after the passage of § 17-7-131 (c) (3). But this court went a step further and, applying constitutional principles, held that Fleming and Foster would be sentenced to life imprisonment if they established retardation *by a preponderance of the evidence.* The majority today does not explain why the constitutional reasoning applicable to Fleming and Foster is not applicable to Burgess.

The majority now sets forth that OCGA § 17-7-131 (c) (3) and (j) provide the legislative framework for implementation of Georgia's public policy that execution of mentally retarded persons violates the prohibition against cruel and unusual punishment. However, that legislative framework was in place at the time of the *Fleming* decision in 1989 (see Ga. L. 1988, p. 1003, § 1), and this court recognized its existence. *Fleming v. Zant,* supra at 687-688. Aware of the legislatively-established "beyond a reasonable doubt" standard of proof, this court concluded it was cruel and unusual punishment to execute anyone who had established by a preponderance of the evidence that he was mentally retarded. See id. at Division 4. In reaching that conclusion, this court either implicitly held the legislatively-enacted beyond a reasonable doubt standard was unconstitutional, or envisioned a two-step procedure to ensure that Georgia did not execute a mentally retarded person. Because I am reluctant to endorse the concept of implicit holdings of unconstitutionality, I take the position that the *Fleming* court's setting of "preponderance of the evidence" as the constitutional standard was an effort to establish a two-tiered jury determination concerning a defendant's claim of mental retardation.

OCGA § 17-7-131 (c) (3) states:

> The defendant may be found "guilty but mentally retarded" if the [factfinder] finds beyond a reasonable doubt that the defendant is guilty of the crime charged and is mentally retarded. If the [factfinder] should make such finding, it shall so specify in its verdict.

The trial court's charge during the guilt/innocence phase accurately reflected the statutory requirement that mental retardation beyond a reasonable doubt must be found before a jury can return a verdict of guilty but mentally retarded and thereby effectuate the statutory preclusion of the death penalty found in OCGA § 17-7-131 (j).

However, at the sentencing phase, we must be cognizant of the constitutional preclusion of the death penalty. In *Fleming v. Zant,* supra, we held that "the execution of mentally retarded offenders violates the Georgia constitutional guarantee against cruel and unusual punishment." See also *Zant v. Foster,* supra. During the sentencing

phase, the jury may not be precluded from considering any aspect of the defendant's character or personal history in mitigation. *Romine v. State*, 251 Ga. 208 (11) (305 SE2d 93) (1983). This includes evidence bearing on the issue of the defendant's mental retardation. A jury's finding of guilt beyond a reasonable doubt "does not necessarily mean that no juror entertained *any* doubt whatsoever." *Cook v. State*, 255 Ga. 565, 586, n. 11 (340 SE2d 843) (1986). A juror may find no "reasonable" doubt, yet some degree of doubt persists. Such a doubt benefits the defendant in the penalty phase of trial, "for the juror entertaining doubt which does not rise to reasonable doubt can be expected to resist those who would impose the irremedial penalty of death." Id. See also *Wade v. State*, 261 Ga. 105, 110 (401 SE2d 701) (1991) (Clarke, C. J., dissenting). Similarly, a juror's determination during the guilt/innocence stage of trial that the defendant did not prove mental retardation beyond a reasonable doubt does not preempt during the sentencing phase a finding that the defendant was sufficiently mentally retarded to preclude, under constitutional standards, the imposition of the death penalty. A juror may conclude that some degree of mental retardation exists and should be able to consider this proof of retardation during the penalty phase of trial, and to perhaps "resist those who would impose the irremedial penalty of death." *Cook*, supra, 255 Ga. at 586, n. 11. Should the jury find by a preponderance of the evidence that the defendant is mentally retarded, imposition of the death penalty is constitutionally prohibited. *Fleming v. Zant*, supra.

Appellant, who unsuccessfully raised the issue of mental retardation during the guilt/innocence phase of trial, was entitled to present evidence of mental retardation as a mitigating circumstance during the sentencing phase, and was entitled to an instruction informing the jury that a sentence of death could not be recommended if it had been established by a preponderance of the evidence that appellant was mentally retarded. Such an instruction would have been in line with our determination that the constitutional prohibition against cruel and unusual punishment requires that the defendant be sentenced to life imprisonment should it be determined by a preponderance of the evidence that he is mentally retarded. *Fleming v. Zant*, supra at Division 4.

2. I also disagree with the majority's conclusion that the trial court's failure to give appellant "potentially mitigating" evidence from his DFACS file was "harmless at most." While the court, as a whole, would agree that the interest for keeping DFACS records confidential does not outweigh a capital defendant's need for access to potentially mitigating evidence (*Pope v. State*, 256 Ga. 195 (22) (345 SE2d 831) (1986)), I cannot agree that the failure to disclose potentially mitigating evidence is harmless error.

"[A]n individualized sentencing decision is essential in capital cases. [Cit.]" *Conner v. State*, 251 Ga. 113 (5) (303 SE2d 266) (1983). Georgia's death penalty statute provides that *any* mitigating circumstance authorized by law must be considered by the jury in reaching that individualized decision. OCGA § 17-10-30 (b). Any aspect of the defendant's character or personal history is ripe for consideration by the sentencing jury. *Romine v. State*, supra at Division 11. The United States Supreme Court has determined that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character. . . ." *Eddings v. Oklahoma*, 455 U. S. 104, 110 (102 SC 869, 71 LE2d 1) (1982); *Lockett v. Ohio*, 438 U. S. 586 (98 SC 2954, 57 LE2d 973) (1978). This court has recognized that *Lockett* and *Eddings* "impose a severe limitation upon the trial court's authority to exclude evidence offered by defendants in the sentencing phase of a death penalty case." *Blankenship v. State*, 251 Ga. 621, 624 (308 SE2d 369) (1983). Taken together, OCGA § 17-10-30 permits the defendant to present evidence as to any mitigating circumstances, and *Lockett* and *Eddings* require the sentencer to listen. *Eddings v. Oklahoma*, 455 U. S. at 115, n. 10.

The trial court's failure to give trial counsel "potentially mitigating" material from the confidential DFACS records amounted to the trial court's improper exclusion of that mitigating evidence from the sentencing jury. The majority forgives the improper exclusion of the mitigating evidence because the defendant had knowledge of the childhood experiences since he had lived through them, because appellant did not state how he would have used the undisclosed confidential information had it been disclosed to him, and because appellant's experts had access to the DFACS file. If personal experience obviates the need for disclosure of confidential material, we can disband the trial court's in camera review of confidential files since death penalty defendants generally seek their own records in search of mitigating circumstances. Second, a death penalty defendant is under no duty to explain *how* he would use mitigating evidence — since he is entitled to present any evidence of mitigating circumstances to the jury, it is not necessary that he disclose how he would use material to which he is entitled. Finally, the "expert" who needs access to evidence in mitigation is the death penalty defendant's lawyer. Whatever access testifying experts had to the confidential files, it is not the equivalent of an attorney reviewing mitigating evidence and planning how best to present such evidence to the jury.

In sum, I am of the opinion that appellant is entitled to a new sentencing trial. As a result, I part ways with the majority which concludes that the sentencing phase of appellant's trial is free of reversible error.

DECIDED DECEMBER 5, 1994 —
RECONSIDERATION DENIED DECEMBER 20, 1994.

*John R. Martin, Edwards & McLeod, Jennifer McLeod,* for appellant.
*David McDade, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige M. Reese, Assistant Attorney General,* for appellee.