A95A2075. ROWER v. THE STATE.
(466 SE2d 897)

BIRDSONG, Presiding Judge.

Curtis Alfonzo Rower was indicted for murder, kidnapping with bodily injury, two counts of kidnapping, and armed robbery, for kidnapping Sarah Ambrusko Tokars and her two young sons, Ricky and Michael, from her home and shooting Sarah Ambrusko Tokars to death. He was convicted on all charges except murder, as to which a mistrial was declared.

The evidence shows that at about 10:00 or 11:00 p.m. on November 29, 1992, Mrs. Tokars and her two sons Ricky and Michael were ambushed by appellant as they arrived home after a Thanksgiving trip. Appellant brandished a shotgun at Mrs. Tokars and her sons and ordered them to get back in the car. Appellant got in the car with Mrs. Tokars and her sons. Appellant, sitting in the back seat next to the sleeping Michael and brandishing his gun, ordered Mrs. Tokars to drive. He shot Mrs. Tokars in the head from a distance of only five inches. Her car careened out of control and landed in a field. The

abrupt stop of the car caused Ricky to hit his head and Michael to wake up. In a state of panic, screaming and crying, nervous, scared and distraught, the boys ran to a nearby house and yelled for help, saying "Our mom's been shot." The occupants of the house could see Mrs. Tokars' car about 120 yards away. The man who opened the door saw brain matter, a "mixture of blood and some kind of white material" on top of the older boy's head. The older boy said a man had shot his mother because she would not turn right when he told her to turn right. Some of the occupants of the house called 911 and went to Mrs. Tokars' car. Two men opened the driver's door and Mrs. Tokars slumped out. Other occupants of the house also ran to the car. One man was holding Mrs. Tokars up, keeping her from falling out of the vehicle; another man shifted her body back into the vehicle. When a policeman arrived and spoke to the two boys, he saw a considerable amount of blood on the older boy's hands and face and what appeared to be brain matter in his hair. The boy told the policeman that the black man told his mother to turn at a certain location "and she refused. At that point his mother screamed and pushed him down into the floorboard. He heard a loud shot" and the black man got out of the car but the boy did not know where he went. There was abundant evidence identifying appellant as the man who committed these crimes. On appeal of the convictions, Rower enumerates three errors. *Held*:

1. Appellant contends the trial court abused its discretion in denying his motion to strike for cause the prospective juror Pepin, who indicated in his written juror questionnaire that he held "strong racial prejudice views" which would prevent him from being an impartial juror but later, on voir dire, explained that he gave such answers because he wanted to avoid jury duty. This juror did not serve in the case, but appellant's position is that he was erroneously forced, to his harm, to use a peremptory strike to remove this prospective juror. Appellant urges that a juror may be disqualified even though he insists he is not biased (*Lively v. State*, 262 Ga. 510 (421 SE2d 528)) and that blatant racial prejudice has no place in the jury box. See *Tennon v. State*, 235 Ga. 594 (220 SE2d 914). Appellant contends the very fact that Pepin admitted he was dishonest in his questionnaire proves false his later statements on voir dire that he could be a fair and impartial juror.

Under assiduous questioning on voir dire, under oath, Pepin stated that despite what he had written on his questionnaire, he "could make a fair decision." He admitted he had not been honest in his responses to the questionnaire because he did not want to sit on the jury as he works on commission and had just started a job and if he does not work he does not get paid. He admitted to having used a certain vulgar racial epithet when referring to African-Americans. He

admitted to a degree of racial prejudice but said he would listen to the evidence. Under oath he said the fact that appellant is black and Mrs. Tokars was white would not impair his ability to consider the case fairly; that the fact that he held strong Christian beliefs would not impair his ability to consider the evidence fairly; that he could fairly consider the issue of punishment and could "make a fair decision"; that, despite his questionnaire response that persons he knows including himself exhibit strong racial prejudice views, he did not have any prejudice that would prevent him from serving as a juror, as he believed "everybody has a little prejudice in them, but I feel that . . . you know, if I was selected, I could make a fair decision." The defense put questions to Pepin as to whether he had had "problems with black people" and he said he had socialized with them well, had no problem in school, and that his problems with black persons "if any" had occurred while he was in college; that he felt white males were oppressed by other ethnic groups who made it seem white males were oppressing them; that he believed, from watching news programs, that Muslims were feisty, rough-natured trouble-causers but that he knew nothing about Buddhists and felt "each to their own beliefs." He stated that he is a Christian and that if he found appellant was not a Christian, he would listen to everything to make a fair decision and would give appellant the same consideration as a Christian, and that he would take into account the defendant's views but he would deal with appellant as he would a Christian white male and that he would not treat appellant any differently than he would a white man who was a member of his church; that he has black friends and although he had used a vulgar racial epithet many times in the past year, he thought this was "normal" behavior for some people and he did not feel there was anything particularly wrong with it. He said that based on a news report he had seen, he did not think black people were as "bright" as white people but he explained this was because they do not have the opportunity to study and he thought that if black people had equal education they would "come out with the same type of reasoning as [white people]" but they do not have such education because of "a lack of motivation to go and they're taught to believe that, you know, they are not going to get ahead"; that he does not think blacks are more of a problem in schools and could not say whether they cause more crime in schools than do whites and in his experience in school, blacks and whites are in a same level on everything; that black teachers are as good as white teachers; that he could listen to mitigating evidence and would take the defendant's background and upbringing into consideration as mitigating circumstances relevant to the crime committed; that the mere fact that he had found a person had committed felony murder would not dictate whether he would give him a death sentence. These are the state-

ments and elaborations he made under oath.

The prospective juror Pepin did not possess any characteristic or fit any category of persons which would authorize or require a challenge for cause as expressly provided in OCGA § 15-12-163. As to whether Pepin's prejudice was so great he should have been stricken as a matter of law, the Supreme Court has held: "Before a juror can be disqualified for cause, it must be shown that an opinion held by the potential juror is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence." *Johnson v. State*, 262 Ga. 652, 653 (424 SE2d 271). In order to obtain a new trial for failure of the trial court to strike a juror for cause, the defendant must show on voir dire such disposition to bias as to deprive the accused of a fair trial. See *Poole v. State*, 262 Ga. 668, 679 (424 SE2d 275). It is a matter of broad discretion of the trial court whether a prospective juror should have been discharged for cause because of prejudice so great as to deprive appellant of a fair trial. See *Jordan v. State*, 247 Ga. 328 (276 SE2d 224).

We find this case to be similar to *Tennon v. State*, supra, in that the prospective juror, in his sworn statements, exhibited a candor which assisted counsel in making his peremptory challenge. See also *Burgess v. State*, 264 Ga. 777 (450 SE2d 680). This juror was altogether more candid, we think, than are most jurors, or so the trial court could reasonably conclude. He explained he could be an impartial juror despite his prejudices, which he thought were common to the human race or not particularly wrong. His credibility under oath is a question for the trial court in the exercise of its discretion. That a venireman may initially express doubt as to his ability to be impartial does not alone demand that he be stricken for cause. See *Lattany v. State*, 193 Ga. App. 438 (388 SE2d 23).

The mere fact that a person admits having used a racial epithet at some time, or exhibits a preference for his religion and views other ethnic groups with suspicion does not render him incapable as a matter of law of impartially considering the criminal responsibility of a person of another race, religion, gender or ethnic group. Unfortunate though it is, ethnocentricity is a norm in all human behavior; even people of the race slandered in this case, including appellant, used that epithet amongst themselves. If such human failings demanded disqualification of a juror for cause as a matter of law, the right to a jury of one's peers would be denied altogether. Where on reflection and deeper questioning, a person who has candidly admitted to such failings concludes nevertheless that he can consider the evidence in a fair and impartial manner, the best view taken of this juror is from the trial court's bench, and we will not disturb its exercise of discretion unless it is manifestly abused. See *Jordan*, supra.

The trial court did not abuse its discretion in determining that Pepin's sworn statements as a whole do not show that he was incapable of giving a fair consideration of the evidence as a matter of law.

2. Appellant contends the trial court erred in denying his motion in limine to exclude a videotape of the crime scene, because the videotape made by a Cobb County Sheriff's lieutenant shows Mrs. Tokars' automobile, and Mrs. Tokars herself, "after both have been materially altered by law enforcement personnel [and] witnesses."

Appellant does not state in what manner he believes the victim and her automobile were materially altered before being videotaped, nor does appellant aver in what manner such alteration harmed appellant. That argument is therefore abandoned. We note however, that the evidence shows the men who immediately came upon the scene opened her car; they evidently did so to aid her if such had been possible. When they opened her driver's side door (against which her head had apparently been leaning), she slumped out, being dead, and the men had to push her body back into the car. This is not a "material alteration" by the police. The jury was well aware of this evidence and were capable of considering it while viewing on videotape Sarah Ambrusko Tokars' body as it rested where exigent circumstances had placed it.

Appellant considers more significant the "inexplicable way . . . the videotape was shot." Citing *Jones v. State*, 250 Ga. 498 (299 SE2d 549), he contends the videotape, because of its technical flaws and imperfections caused by the "cinema-verite" effects used by the cameraman, is not a fair and accurate representation of the crime scene. He contends that while videotaping Mrs. Tokars slumped forward in her car, the cameraman used a "rapid zoom" method which caused the picture to blur, followed by rapid focus; and what initially is a wide angle shot of a portion of the car and Mrs. Tokars "suddenly becomes a blurred object followed by a rapid focus onto a portion of [her] head and blood dripping off a strand of hair. The next scene [shows] a wide angle view of [Mrs. Tokars], a rapid zoom to an indistinguishable object which suddenly focuses onto the car door showing what appears to be blood and tissue on it." This "rapid zoom and focus" technique also showed what appears to be brain and skull fragments on the car door, which had been opened, with a whitish-red bloody substance still drizzling through Mrs. Tokars' hair, into her lap and on the steering wheel. These depictions were relevant to the State's case and were not misleading in any manner nor does appellant suggest in what manner they were "misleading."

We find untrue as a matter of fact appellant's allegations that the videotape is "inaccurate," or that it "materially altered" the crime scene because the cameraman used a "rapid zoom" and "focus" technique. The rapid-focus technique used in this case "altered" nothing.

It clarified much. Appellant has not shown any way in which it was inaccurate. To the contrary, it enabled the jury to see in detail what they may not otherwise have seen except at a wide-angled distorted distance or as a "blur." Moreover, since the evidence showed that neighbors had opened the car door and pushed Mrs. Tokars' body back into the car after it slumped out, it was perfectly clear that the video did not depict Mrs. Tokars' body and the car door exactly as they were when she was killed. A videotape of a scene may be admitted in evidence on the same basis as a still photograph, that is through a foundational showing that it is a fair and accurate representation *of the scene sought to be depicted. Harper v. State*, 213 Ga. App. 444, 449 (445 SE2d 303). Such a showing lays the proper foundation for admission of the videotape, and it was not inadmissible for any reason.

3. Appellant contends he was entitled to a directed verdict of acquittal as to the kidnapping of Michael Tokars. He contends Michael Tokars could not have been abducted "against his will" because he was asleep during this abduction. See OCGA § 16-5-40.

We reject this concept out of hand. Though sleep may render a person mercifully unaware that a crime is being committed against him, it does not deprive him of his "will." The fact that the child had "lost the capacity to remain with appellant voluntarily" does not render his abduction "voluntary." *Taylor v. State*, 194 Ga. App. 871, 873 (392 SE2d 57); see also *Wright v. State*, 209 Ga. App. 128, 129 (433 SE2d 99).

4. We have reviewed the evidence and we find that a rational trier of fact could find appellant guilty of the crimes of which he was convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560).

*Judgment affirmed. Johnson and Smith, JJ., concur.*

DECIDED DECEMBER 18, 1995 —
RECONSIDERATION DENIED JANUARY 19, 1996 —

*Kennedy & Kennedy, David M. Simpson, Edwin Marger, Gordon E. Billheimer, Jr.*, for appellant.

*Thomas J. Charron, District Attorney, Debra H. Bernes, Nancy I. Jordan, Russell J. Parker, Assistant District Attorneys*, for appellee.